## KANSAS CITY ROYALS BASEBALL CORPORATION, Plaintiff,

### v.

## MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION, Defendant,

**Golden West Baseball Company et al., Plaintiff-Intervenors.**

### No. 75–CV–712–W–1

United States District Court,
W. D. Missouri W. D.

Feb. 3, 1976.

Memorandum and Order Feb. 10, 1976.

Final Judgment and Decree Feb. 11, 1976.

234

Louis L. Hoynes, Jr., Robert J. Kheel, Willkie, Farr & Gallagher, New York City, James P. Garner, Baker, Hostetler & Patterson, Cleveland, Ohio, Walter J. Kennedy, Hoskins, King, McGannon, Hahn & Hurwitz, Kansas City, Mo., Phil A. Koury, Harry S. Truman Sports Complex, Harry P. Thomson, Jr., George E. Leonard, Shughart, Thomson & Kilroy, Kansas City, Mo., for plaintiff.

Richard M. Moss, New York City, Gen. Counsel, William A. Jolley, Donald M. Fehr, Gant, Jolley, Moran, Walsh, Hager & Gordon, Kansas City, Mo., for defendant.

## MEMORANDUM OPINION AND ORDER

JOHN W. OLIVER, District Judge.

### I.

This case presents questions concerning the scope and coverage of the arbitration clause contained in Article X of the 1973 Basic Agreement between the American and National Leagues of Professional Baseball Clubs [the Club Owners] and the Major League Baseball Players Association [the Players Association].

The case was commenced on October 28, 1975 when the Kansas City Royals Baseball Corp. filed its complaint invoking the declaratory judgment jurisdiction of this Court. The remaining 23 Major League clubs became plaintiff-intervenors shortly thereafter. The Players Association, the defendant in this case, by way of original and amended counterclaim, invoked the independent jurisdiction of this Court conferred by § 301 of the Labor Management Relations Act, as amended, 29 U.S.C. § 185, praying that the Club Owners comply with the award of an Arbitration Panel which, pursuant to agreed procedures in this Court, had considered the grievances under the arbitration procedures provided in the collective bargaining agreement between the parties and had rendered its award on December 23, 1975.

The Players Association filed notice of grievance No. 75–27 on October 7, 1975 on behalf of John A. Messersmith's 1974 Uniform Players Contract with the Los Angeles Dodgers.[1] A similar grievance

---

1.

**NOTICE OF GRIEVANCE**

TO: Player Relations Committee

FROM: Major League Baseball Players Association

DATE: October 7, 1975

SUBJECT: Grievance No. 75–27
Major League Baseball Players Association and the 24 Major League Clubs

On or about March 10, 1975, the Los Angeles Dodgers renewed the 1974 Uniform Player's Contract of John A. Messersmith, pursuant to paragraph 10(a) thereof, for the period of one year.

Paragraph 10(a) of the Contract provides, in relevant part, as follows:

" . . . If prior to the March 1 next succeeding said December 20, the Player and the Club have not agreed upon the terms of such contract, then on or before 10 days after said March 1, the Club shall have the right by written notice to the player . .

was filed in connection with the 1974 Uniform Players Contract of David A. McNally with the Montreal Expos.[2]

This Court conducted its first pretrial conference with counsel on November 6, 1975. Subsequent to that conference, the parties entered into a stipulation of record which provided as follows:

1. That the scheduled arbitration proceedings should go forward in accordance with the letter of Mr. Peter Seitz, dated November 3, 1975, to Mr. Marvin J. Miller and Mr. John J. Gaherin which anticipates that the arbitration panel will afford the parties a full and fair opportunity to present all arguments based on jurisdictional considerations;

2. That the arbitration panel shall hear and decide the jurisdictional question and, if appropriate, proceed and decide the arbitration proceedings on the merits; and

3. That the jurisdictional question may later be presented to this Court for its determination on the basis of the record made before the arbitration panel, together with any other relevant and material evidence which either side may wish to adduce before this Court.

In accordance with that stipulation, the parties proceeded to arbitration. Hearings were held before an Arbitration Panel composed of Peter Seitz, Chairman and Impartial Arbitrator agreed upon by the parties; John J. Gaherin, Club Owners' arbitrator; and Marvin J. Miller, Players Association arbitrator. Hearings were held before the Arbitration Panel on November 21, 24 and December 1, 1975. Sworn testimony amounting to 842 pages was presented, together with 97 exhibits introduced as either Joint Exhibits, Club Owners exhibits or Players exhibits. A 61 page Opinion of Impartial Chairman of Arbitration Panel was filed by Mr. Seitz, the Impartial Arbitrator, and the following award was rendered by the Arbitration

---

to renew this contract *for the period of one year* on the same terms . . . " (Emphasis supplied)

The Uniform Player's Contract defines "year", in paragraph 1, as:

" . . . including the Club's training season, the Club's exhibition games, the Club's playing season, the League Championship Series and the World Series (or any other official series in which the Club may participate and in any receipts of which the Player may be entitled to share)."

Mr. Messersmith performed for the Los Angeles Club in 1975 under the renewed Contract, and, since the Club was not eligible for any official post-season series, he completed the renewal year on September 28, 1975. As of September 29, 1975, the specified term of Mr. Messersmith's renewed Contract having expired, there was no longer any relation between the Los Angeles Club and the player, and Mr. Messersmith became free to negotiate with any of the 24 clubs with regard to his services for 1976. However, the clubs, acting through their agents and representatives, have conspired to deny Mr. Messersmith that right, and have maintained the position that the Los Angeles Club is still exclusively entitled to his services.

The clubs promptly should be ordered to treat Mr. Messersmith as a free agent, and should make Mr. Messersmith whole for any damages he may suffer due to the delay in doing so.

---

2. NOTICE OF GRIEVANCE

TO: Player Relations Committee

FROM: Major League Baseball Players Association

DATE: October 9, 1975

SUBJECT: Grievance No. 75–28
Major League Baseball Players Association and the 24 Major League Clubs

---

On or about March 10, 1975, the Montreal Expos renewed the 1974 Uniform Player's Contract of David A. McNally, pursuant to paragraph 10(a) thereof, for a period of one year.

As of September 29, 1975, the specified term of Mr. McNally's renewed Contract having expired, there was no longer any relation between the Montreal Club and the player, and Mr. McNally became free to negotiate with any of the 24 clubs with regard to his services for 1976. However, the clubs, acting through their agents and representatives, have conspired to deny Mr. McNally that right, and have maintained that the Montreal Club is still exclusively entitled to his services.

The clubs promptly should be ordered to treat Mr. McNally as a free agent, and should make him whole for any damages he may suffer due to the delay in doing so.

Panel on December 23, 1975, with Mr. Gaherin dissenting. The award stated:

## AWARD

### 1. *Jurisdiction:*

It is found and decided that the Messersmith and McNally grievances, despite the claimed effect of the provisions of Article XV of the Basic Agreement, are within the scope of the provisions of Article X of the Basic Agreement; and, accordingly, are within the duty and the power of the Arbitration Panel to arbitrate. The application of the leagues, made on jurisdictional or procedural grounds, is denied.

### 2. *The Merits:*

The grievances of Messersmith and McNally are sustained. There is no contractual bond between these players and the Los Angeles and the Montreal clubs, respectively. Absent such a contract, their clubs had no right or power, under the Basic Agreement, the Uniform Player Contract or the Major League Rules to reserve their services for their exclusive use for any period beyond the "renewal year" in the contracts which these players had heretofore signed with their clubs.

### 3. *Relief:*

The leagues involved in these proceedings, without delay, shall take such steps as may be necessary to inform and instruct their member clubs that the provisions of Major League Rules 4–A(a) and 3(g) do not inhibit, prohibit or prevent such clubs from negotiating or dealing with respect to employment with the grievants in this case; also, that Messersmith shall be removed from the reserve list of the Los Angeles Club and McNally from the reserve or disqualified lists of the Montreal Club.

On the basis of the present record, the Arbitration Panel denies the Messersmith and McNally grievances to the extent that their respective clubs shall make them whole for any damage suffered by them in the exercise of reserve rights to their services.

The Arbitration Panel retains jurisdiction of the disputes represented by these grievances; but only as to the nature and extent of relief to which the grievants may be entitled under this Award.

Prior to the pretrial conference held in this Court on January 8, 1976, the parties were directed to file appropriate statements of their respective positions in regard to this case. The responses of both parties, filed as directed on January 7, 1976, revealed that the positions of all parties in regard to the questions presented were in substantial accord. All parties agreed in substance that two questions are presented for this Court's determination: (1) Did the Arbitration Panel have jurisdiction under the provisions of the Basic Agreement to hear and decide the grievances filed by the Players Association on behalf of Messersmith and McNally and to grant the relief awarded; and (2) is the Players Association entitled to an order of this Court specifically enforcing the Award of the Arbitration Panel in regard to the Messersmith and McNally grievances?[3]

The Players Association stated in its January 7, 1976 response to the Court's inquiry that it did not anticipate the necessity of adducing any additional evidence other than the various pleadings, affidavits and documents filed in this Court together with a copy of all the proceedings before the Arbitration Panel, including a transcript of the testimony, the documentary evidence introduced during the arbitration proceedings, and the Opinion of Impartial Chairman of Arbitration Panel and the Award of the Arbitration Panel. The Players Association stated that it was its position that

---

**3.** The Club Owners statement of the second question was stated in somewhat more rhetorical language than that used by the Players Association. The Club Owners posed the second question in the following language:

Did the Arbitrator exceed his power in imposing his own philosophy and personal brand of industrial justice in disregard of the plain meaning and century old practice of the baseball reserve system?

any evidence which is not contained in that data was neither relevant nor material to the questions presently before this Court.

The Club Owners tentatively indicated that they might wish to adduce a limited amount of additional evidence by calling Alexander Hadden, presently secretary-treasurer and general counsel in the Office of the Commissioner of Baseball, but who was previously counsel for the American League and had participated in various meetings and negotiations held and conducted during the 1967–1970 period of collective bargaining between the parties. The Club Owners indicated that they might also call Bowie K. Kuhn, Commissioner of Baseball, to testify concerning the meaning, effect, and history of the reserve system, and Ewing Kauffman, owner of the Kansas City Royals, to testify about the meaning and effect of the reserve system and his reliance thereon as a substantial investor.

Proceedings at the January 8, 1976 pretrial conference established that counsel for both sides wished to cooperate with each other and with this Court to eliminate all areas of substantial dispute about any factual circumstances which could be admitted by stipulation. Counsel were also agreeable to an attempt to design procedures under which the questions of law presented by the case could be decided in a fair and expeditious manner.[4]

Further procedures were developed at a later pretrial conference held January 19, 1976, pursuant to which the parties subject to reserved objections to materiality and relevancy, agreed upon the factual accuracy of 73 proposed findings of fact which had theretofore been submitted by the Club Owners and upon all 18 proposed findings of fact proposed by the Players Association. In light of that stipulation, the Club Owners revised their original proposed findings of fact and submitted 37 new proposed findings. There is no substantial dispute about many of the new findings of fact proposed by the Club Owners, although there are a number of questions of law put in focus by the new proposed findings.

The Players Association adhered to its position that no additional evidence was necessary under the circumstances and reiterated that, indeed, any additional evidence would be irrelevant and immaterial. The Club Owners, however, adhered to the position stated in their response filed January 7, 1976, that additional evidence, both testimonial and documentary, should be received. Accordingly, the matter was set for plenary evidentiary hearing to commence January 26, 1976. The record, consisting of well over 400 pages taken on January 26, 27, and 28, 1976, contains the testimony of Warren Giles, President Emeritus of the National League; Marvin J. Miller, Executive Director of the Major League Baseball Players Association; Richard M. Moss, General Counsel for the Players Association; Alexander H. Hadden, formerly general counsel for the American League and presently General Counsel in the Office of the Commissioner of Baseball; and Louis Hoynes, General Counsel for the National League. The Court also received in evidence, primarily by way of stipulation, voluminous exhibits which reflected the trial and appellate procedures incident to the case of *Flood v. Kuhn*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); a copy of the "Celler Report," a House Report of the Subcommittee on Monopoly Power, 82nd Cong. 1952; and a record of numerous arbitration decisions rendered pursuant to the grievance procedures agreed upon by the parties in their various collective bargaining agreements.

By reason of the exemplary cooperation of counsel, the formal findings of

---

**4.** The Court reiterates its commendation, frequently stated of record during the course of this litigation, in regard to all counsel for all parties in this case. The procedures designed, primarily by counsel, but with the grateful approval of the Court, will serve as a model of how unnecessary disputes in regard to factual circumstances may be eliminated pursuant to the flexible procedures provided in the Federal Rules of Civil Procedure.

fact which this Court deems material and relevant to the questions presented in regard to the labor controversy before the Court are agreed to by the parties. Additional findings of fact which will be made elsewhere in this memorandum opinion shall, of course, be considered as findings made pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## II.

On January 16, 1976, the Players Association proposed 18 separate findings of fact. Paragraphs 74 through 91, inclusive, of the stipulation subsequently entered into by the parties are stated in exactly the same language as that contained in the Players Association's original proposed findings. The stipulation, of course, reserved objections as to relevancy and materiality. We find and conclude that all 18 of the Players Associations' proposed findings are relevant and material. We accordingly make the following 18 findings in the language stipulated by the parties:[5]

1. The plaintiff and plaintiffs-intervenors are employers in an industry affecting commerce.

2. The defendant Major League Baseball Players Association is a labor organization, within the meaning of 29 U.S.C. § 152(5) representing employees in an industry affecting commerce.

3. The defendant Major League Baseball Players Association is the sole and exclusive bargaining agent for all Major League Baseball Players including those of the plaintiff and plaintiffs-intervenors.

4. The defendant Association, and its officers and/or agents, are engaged in representing its members within the geographical limits of this federal judicial district.

5. Exhibit A to the Original Complaint of plaintiff Kansas City Royals Baseball Corporation is a true and accurate copy of the collective bargaining agreement in effect, to which all parties to this litigation are signatory, at the time this litigation was commenced by plaintiff.

6. On October 7 and 9, 1975, respectively, the defendant Association filed two grievances, identified as Grievance No. 75–27 and Grievance No. 75–28.

7. True and accurate copies of said grievances are attached to the original complaint of the plaintiff Kansas City Royals Baseball Corporation, as Exhibits B and C thereto.

8. True copies of said grievances were also entered into evidence before the arbitration panel as Joint Exhibits 1 and 2.

9. The defendant Association affirmatively asserts and contends that the grievances at issue must be resolved in arbitration under the collective bargaining agreement.

10. The plaintiff and plaintiffs-intervenors assert that the grievances involved are not the subject of the grievance and arbitration provisions contained in the collective bargaining agreement.

11. There is a substantial and continuing controversy between the plaintiff and plaintiffs-intervenors on the one hand, and the defendant Association on the other hand, concerning the arbitrability under the collective bargaining agreement of the grievances involved, the plaintiff and plaintiffs-intervenors contending that said grievances are not arbitrable under the agreement, and the defendant Association contending that said grievances are subject to the grievance and arbitration provisions of the collective bargaining agreement.

12. On November 14, 1975, the parties to this proceeding entered into a stipulation and agreement which is on file with this Court, by which the grievances at issue were to proceed to arbitra-

---

5. We have renumbered the paragraphs as they appear in the stipulation, our finding No. 1 appears as stipulation paragraph 74; our No. 2 is stipulation paragraph 75; etc., and in sequence.

tion. That stipulation provides as follows:

1. That the scheduled arbitration proceedings should go forward in accordance with the letter of Mr. Peter Seitz, dated November 3, 1975, to Mr. Marvin J. Miller and Mr. John J. Gaherin which anticipates that the arbitration panel will afford the parties a full and fair opportunity to present all arguments based on jurisdictional considerations;

2. That the arbitration panel shall hear and decide the jurisdictional question, and, if appropriate, proceed and decide the arbitration proceedings on the merits; and

3. That the jurisdictional question may later be presented to this Court for its determination on the basis of the record made before the arbitration panel, together with any other relevant and material evidence which either side may wish to adduce before this Court.

13. Pursuant to the above stipulation, the grievances at issue in this proceeding were presented to the Arbitration Panel on November 21, 1975, November 24, 1975, and December 1, 1975.

14. The proceedings before the Arbitration Panel are fully and completely reflected in the transcript of the proceeding before the Arbitration Panel on each of the above dates, which is before this Court by stipulation of the parties, which included Joint Exhibits 1–9; Players Exhibits 1–18 and Clubs Exhibits 1–72.

15. On December 23, 1975, the opinion of the Impartial Chairman of the Arbitration Panel was issued, and the Award of the Arbitration Panel was issued. A true and accurate copy of said opinion and Award have by stipulation and agreement of the parties been entered into the record of this case.

16. It is currently the position and contention of plaintiff and plaintiffs-in-tervenors that the decision and Award of the Arbitration Panel should be vacated and set aside by this Court.

17. The defendant Association requests, by way of its First Amended Counterclaim that the plaintiff and plaintiffs-intervenors be specifically ordered and directed by this Court to comply in all particulars with the Award of the Arbitration Panel.

18. The plaintiff and plaintiffs-intervenors will not comply with the Award of the Arbitration Panel unless and until compelled to do so by order of this Court.

The stipulation of the parties reflects that paragraphs 1 through 73 of that stipulation are proposed findings of fact as suggested by the Club Owners which the Players Association agrees are true but which the Players Association contends are not relevant or material to any issue present in this case. Except for the Club Owners proposed findings which in substance duplicate those proposed by the Players Association (paragraphs 1 through 4, inclusive, 36 and 39 of the stipulation of facts), we find and conclude that all of the remainder of the Club Owners' proposed findings, other than those to be presently stated, are neither relevant nor material to any question before the Court.

Accordingly, we expressly refuse to make any of the findings proposed by the Club Owners, as they appear in the stipulation of the parties, except those stated in paragraphs 43, 45, 46, 47, 62, 63, 63(a), 64, 71, 72, 73, and 38. We make those findings stipulated in those particular paragraphs of the stipulation for the purpose of stating the background of the collective bargaining between the parties which led to the 1968, 1970, and 1973 Basic Agreements to which the parties have made reference in their respective legal arguments. We accordingly make the following additional findings in the language stipulated by the parties: [6]

6. Our findings are renumbered in the same manner as followed in connection with our

acceptance of the Players Association's proposed findings. The sequence, however, fol-

19. In 1968, 1970 and 1973 three Basic Agreements were entered into between the Association and the clubs.

20. The first Basic Agreement was executed on February 19, 1968.

21. Article VIII of the 1968 Basic Agreement provided as follows:

ARTICLE VIII—Joint Studies

The parties shall review jointly the matters of (a) length of the championship season and (b) possible alternatives to the reserve clause as now constituted.

The joint review of the matter of the length of the championship season shall commence as early as practicable and shall be completed prior to the drawing up of the preliminary schedules for 1969.

The joint review of the reserve clause shall be completed prior to the termination date of this Agreement.

Subject to Article III, Section B, it is mutually agreed that the Clubs shall not be obligated to bargain or seek agreement with the Players Association on either of the above matters during the term of this Agreement.

22. Subsequent to the execution of the 1968 Basic Agreement three meetings between the parties took place pursuant to clause (b) of the first paragraph of Article VIII.

23. A second Basic Agreement was executed on May 21, 1970 between the Clubs and the Association.

24. The 1970 Basic Agreement contained the following provision in Article XIV with respect to the Reserve System:

ARTICLE XIV—Reserve System

Regardless of any provision herein to the contrary, this Agreement does not deal with the reserve system. The parties have differing views as to the legality and as to the merits of such system as presently constituted. This Agreement shall in no way prejudice the position or legal rights of the Par-

ties or of any Player regarding the reserve system.

25. The necessity of Article XIV to the Association was suggested by Arthur Goldberg, counsel in the *Flood* litigation, in order to avoid any possibility of prejudicing the *Flood* litigation as a result of the Association being charged with having agreed to the reserve system:

26. The 1970 Basic Agreement also contained the following Article relating to Management's rights:

ARTICLE XV—Management Rights

Nothing in this Agreement shall be construed to restrict the rights of the Clubs to manage and direct their operations in any manner whatsoever except as specifically limited by the terms of this Agreement.

27. On February 25, 1973, the Association and the Clubs entered into a new Basic Agreement.

28. Article XV of the 1973 Basic Agreement provided as follows:

ARTICLE XV—Reserve System

Except as adjusted or modified hereby, this Agreement does not deal with the reserve system. The Parties have differing views as to the legality and as to the merits of such system as presently constituted. This Agreement shall in no way prejudice the position or legal rights of the Parties or of any Player regarding the reserve system. During the term of this Agreement, neither of the Parties will resort to any form of concerted action with respect to the issue of the reserve system, and there shall be no obligation to negotiate with respect to the reserve system.

29. Article XVI of the 1973 Basic Agreement provided as follows:

ARTICLE XVI—Management Rights

Nothing in this Agreement shall be construed to restrict the rights of the Clubs to manage and direct their operations in any manner whatsoever ex-

---

lows the same order as the paragraphs of the stipulation earlier identified. In other words, our finding 19 is stipulation paragraph 45, and

our finding 20 is stipulation paragraph 46, etc., and in sequence.

cept as specifically limited by the terms of this Agreement.

30. The Major League Rules in 1966 included the following:

## Rule 4–A

### Reserve Lists

(a) FILING. On or before November 20 in each year, each Major League Club shall transmit to the Commissioner and to its League President a list of not exceeding forty (40) active and eligible players, whom the club desires to reserve for the ensuing season; and also a list of all its players who have been promulgated as placed on the Military, Voluntarily Retired, Restricted, Disqualified, Suspended or Ineligible Lists; and players signed under Rule 4 who do not count in the club's under control limit. On or before November 30 the League President shall transmit all of said lists to the Secretary-Treasurer of the Executive Council, who shall thereupon promulgate same, and thereafter no player on any list shall be eligible to play for or negotiate with any other club until his contract has been assigned or he has been released.

(b) SALARY UNPAID. A club shall have no right to reserve a player to whom it is indebted for arrears in salary as to which no bona fide undecided dispute exists; and upon application by any such player, the Commissioner may remove such player's name from the Reserve List and declare him a free agent.

(c) RETIRED, RESTRICTED, DISQUALIFIED OR INELIGIBLE PLAYERS. A player reserved for two (2) consecutive years on the Voluntarily Retired, Restricted, Disqualified or Ineligible Lists shall be omitted from future Reserve Lists but shall not be eligible until first reinstated in accordance with Rule 16, Major League Rules, and upon such reinstatement, he shall be restored to the Active List of the club with which connected when he retired or became ineligible.

\* \* \* \* \* \*

## Rule 15

## RESTRICTED, DISQUALIFIED AND INELIGIBLE LISTS

(a) RESTRICTED LIST. If, without permission from his club a player fails, within ten (10) days of the opening of his club's championship season, to report to, or contract with, his club, he may be reported by the club to the Commissioner, if a Major League player, or to the President of the National Association, if a National Association player, for placement on the "Restricted List." A player on the Restricted List shall not be eligible to play for any Major League or National Association Club until he is reinstated.

(b) DISQUALIFIED LIST. A player who violates his contract or reservation may be reported to the Commissioner, if a Major League player, or to the President of the National Association, if a National Association player, for placement on the "Disqualified List." A player on the Disqualified List shall not be eligible to play with any Major League or National Association Club until reinstated.

(c) INELIGIBLE LIST

(1) A PLAYER OR OTHER PERSON found guilty of misconduct or other acts mentioned in Professional Baseball Rule 21, or convicted of a crime involving moral turpitude, may be placed on the "Ineligible List" by the Commissioner, if associated with a Major League or Major League Club, or by the President of the National Association, if associated with a National Association League or a National Association Club. A player or other person on the Ineligible List shall not be eligible to play or associate with any Major League or National Association Club until reinstated. No application for reinstatement from the Ineligible List may be made until after the lapse of one (1) year from the date of placement on the Ineligible List.

\* \* \* \* \* \*

(e) PLAYER STATUS. A player on the Restricted, Disqualified, Voluntarily Retired or Ineligible List shall not be tendered a contract. A player on the Restricted, Disqualified or Ineligible List shall not (1) be unconditionally released, and (2) shall not be entitled to salary, while on any such list, nor after reinstatement from any such list until such date (not exceeding thirty (30) days after reinstatement) as he is in condition to participate in championship games to the satisfaction of his club.

\* \* \* \* \* \*

(g) RESERVATIONS. A player on the Restricted, Disqualified or Ineligible List may be reserved as such for two (2) consecutive years, at the expiration of which he need not be reported on the club's annual Reserve List and will automatically be transferred to a General Restricted List, General Disqualified List or General Ineligible List.

\* \* \* \* \* \*

Rule 3

\* \* \* \* \* \*

(g) TAMPERING. To preserve discipline and competition, and to prevent the enticement of players, coaches, managers and umpires, there shall be no negotiations or dealings respecting employment, either present or prospective, between any player, coach or manager and any club other than the club with which he is under contract or acceptance of terms, or by which he is reserved, or which has the player on its Negotiation List, or between any umpire and any league other than the league with which he is under contract or acceptance of terms, unless the club or league with which he is connected shall have, in writing, expressly authorized such negotiations or dealings prior to their commencement.

We reject the Club Owners' proposed findings as they appear in paragraphs 5 through 32(a) for the reason that those proposed findings relate gen-

erally to the manner in which the owners of baseball clubs unilaterally operated their business from 1879 through approximately the end of World War II. The Panel considered all that historical material. Those factual circumstances, however, are not relevant or material to the determination of the legal questions presented in this case.

There can be no doubt, of course, that the Club Owners' apparent preoccupation with how baseball clubs were operated in the 19th Century and before the year 1968, when, by reason of the 1968 Basic Agreement, the Club Owners as employers and the players as employees both became subject to Section 203(d) of the Labor Management Relations Act, 29 U.S.C. § 173(d), upon which the applicable federal law and policy favoring arbitration of labor disputes is grounded, may have affected the willingness of particular Club Owners to recognize the quite fundamental differences between those two periods of baseball history. But even if that quite speculative circumstance be assumed to be true, an assumption which we need not and do not make, the history of how club owners may have run their business in the 19th Century and that portion of the 20th Century before they entered into a collective bargaining agreement with a recognized labor organization representing its employees simply is not relevant or material to the determination of the legal questions presented in this case.

We reject findings 33 through 37(a), inclusive, and 49 through 61, inclusive, paragraphs of the stipulation which relate to the *Flood v. Kuhn* litigation, for the reason that we find and conclude that the Club Owners' "*Res Judicata* -Preclusion; Inconsistent Positions" argument, as stated in its various briefs filed in this Court, is not tenable as a matter of law. We likewise find and conclude that paragraphs 65, 66, and 69 relating to what Mr. Miller stated in testimony before the Congress in 1972, what he said in a speech to the City Club in Cleveland on February 6, 1972, and what he said during a radio interview on

December 24, 1972, cannot, as a matter of law, be considered to be relevant or material to any legal question presented in this case.

The remaining paragraphs, which need not be referred to specifically by number, relate to various preliminary proposals or statements made at one of the three Joint Study meetings or during one of the negotiating sessions in connection with some Basic Agreement, eventually reduced to final form, and they cannot be considered for the purpose of altering or varying the language which appears on the face of the 1973 Basic Agreement. See *Local Union No. 787 v. Collins Radio Co.,* (5th Cir. 1963) 317 F.2d 214, a case which the Club Owners cite and rely upon as stating their view of the parol evidence rule. See also Club Owners' definitive statement of their position in regard to the parol evidence rule on page 99 of the transcript in this Court: "The Club Owners' position is that the contract is clear on its face, that our position is that parol evidence is not required to interpret. Now, that's our position." Counsel for the Club Owners agreed that their position was substantially reflected by *Collins Radio,* just cited. See page 100 of the transcript of proceedings in this Court.

We turn now to the Club Owners' proposed findings of fact which were not included in the stipulation of facts.

### III.

Many of the Club Owners' 37 final proposed findings of fact which were not included in the stipulation of the parties, generally speaking, are directed to the same subject matter already discussed in regard to our rejection of the Club Owners' proposed findings as contained in particular paragraphs of the stipulation. For example, paragraphs 1 through 6 of the Club Owners' unstipulated proposed findings request that we accept particular broad and quite indefinite conclusions stated in the 1952 Celler Report, prepared long before the Players Association became the recognized bargaining agent representing players employed by the presently existing Major League Clubs.[7]

Paragraphs 9 through 12, inclusive, paragraphs 16 through 19, inclusive, and paragraphs 25 and 26, all relate to details of the *Flood* litigation and are rejected for the reasons heretofore stated in connection with the *Flood* paragraphs contained in the stipulation.

While we find and conclude that the remaining paragraphs in the Club Owners' proposed findings are irrelevant and immaterial to any question of law presented in this case, we believe it appropriate, in light of the almost inevitable appeal which will follow this Court's decision, to add a word concerning the remainder of the Club Owners' proposed findings which are not stipulated.

We reject Club Owners' proposed findings 7 and 8, which suggest that we find that since the adoption of the first reserve rule in 1878, all subsequent forms of reserve rules "have always been applied and administered independently of any contractual relationship the Club might have with the Players." Proposed finding 8 would have us find that since the 1903 Peace Compact, the Clubs of the American and National Leagues "have agreed among themselves" that each of those clubs "had a career-long right (absent assignment or release) as against the other League clubs to deal

---

7. Indeed, the Celler Report was prepared before the Major League Baseball Players Association was even organized. *The New York Times Book of Baseball History,* at page 175, contains a reprint of an AP story published in the July 13, 1954 *New York Times* which reported the conversion of a players' representatives group, organized informally in 1946 and known as a "players' fraternity," into the association which later, in 1968, became the recognized bargaining agent under federal law for all Major League baseball players. The newspaper story was carried under a headline and a subhead which, looking back over less than a quarter of the 20th Century of baseball history, somewhat ironically stated: "PLAYERS ORGANIZE AND RETAIN LEWIS. But Attorney Denies Major League Representatives Have Formed a Union."

exclusively with the players reserved by each club."

We reject both of those findings for the reason that the rights of the parties in this case are not controlled by what may have been the unilateral practice of owners from 1878 to the signing of the 1968 Basic Agreement. In this case, the rights of the parties are controlled by the 1973 Basic Agreement, which expressly provides in Article III for the form of a Uniform Players Contract "between a Club and a player . . . attached hereto as Schedule A, which is incorporated herein by reference and made a part hereof."

Paragraph 9(a) of that Uniform Players Contract provides that "the Club and the Player agree to accept, abide by and comply with all provisions of the Major League Agreement, the Major League Rules, the Rules or Regulations of the League of which the Club is a member, and the Professional Baseball Rules, in effect on the date of this Uniform Players Contract, which are not inconsistent with the provisions of this contract or the provisions of any agreement between the Major League Clubs and the Major League Baseball Players Association . . . ."

■ Factual circumstances which relate to the practices which may have been followed in connection with reserve rules agreed upon unilaterally by baseball clubs in existence in 1878, and practices followed under other unilateral agreements between the then-existing clubs of the American and National Leagues which may have been entered into since the 1903 Peace Compact, simply are not relevant or material in determining the legal rights and obligations of the parties under the 1973 Basic Agreement. That agreement is governed by the same federal law applicable to any other collective bargaining agreement between employers engaged in an industry affecting commerce and a recognized labor organization representing employees in that industry. The fact that the employees happen to be baseball players and the industry happens to be business organizations owning baseball clubs does not permit the application of a different rule of law than that applicable to all employers and all recognized labor organizations in any other industry which affects commerce. The fact that the owners of the Major League baseball clubs are, by reason of Supreme Court decision, exempt from the Antitrust laws of the United States does not mean that they, or their employees, are exempt from other federal law applicable to industries which affect commerce.

The Club Owners' proposed findings 13, 14, 15, 22, 23, 24, 27, 28, 29, and 30, all relate in one way or another to the Club Owners' argument that the words "Reserve System" had a definite meaning which was understood and agreed upon by the parties and that such meaning must be read into Article XV of the 1973 Basic Agreement. Those findings also, somewhat inconsistently, proposed that we find that the words "Reserve System" also must be considered as having a synonymous meaning with what the Club Owners refer to as the "core," or "heart," or "guts" of "Baseball's career-long player control mechanism," whatever those words might mean.

In regard to proposed finding 13, we could find, if relevant and material, that Mr. Carroll, then counsel for the National League, may have made some statement on April 24, 1969, concerning the Celler Committee in 1951 generally accepted as the meaning of the "reserve clause" as including "(1) renewal option; (2) reserve list; and (3) no tampering rule . . . [and] many other [unidentified] rules [such as] options, waivers, etc." We could find, if relevant and material, that those opening remarks were made at the first meeting of the 1969 Joint Study mandated by the 1968 Basic Agreement as recorded by the Hadden Notes.

We could not, however, find that those words in any way reflected an agreed understanding between the parties at any time as to what might be meant by the words "Reserve System" as those words were subsequently used in Article

XIV in the 1970 Basic Agreement and as they were used in Article XV of the 1973 Basic Agreement. Although we made specific inquiry, we have never been able to understand either the factual argument or the legal argument which is based upon some sort of distinction which exists in the Club Owners' minds between the "core," the "heart," or the "guts" of the Reserve System, the "periphery" of the Reserve System, and the "Reserve System" itself.[8]

■ On the basis of the evidence adduced before the Arbitration Panel, where the same argument was made and rejected, and on the basis of evidence introduced at the plenary evidentiary hearing conducted in this Court, we find and conclude that the words "Reserve System," as used in Article XV of the 1973 Basic Agreement, and as used in Article XIV of the 1970 Basic Agreement, or as used in any other document which could be said to be a part of the collective bargaining agreement between the parties, never acquired the status of "words of purchase" and were never the subject of any agreed meaning as understood by the parties to the collective bargaining agreement.

We expressly find that the testimony both before the Arbitration Panel and that independently introduced before this Court, in which various witnesses attempted to refresh their recollections concerning various cryptic notes made contemporaneously at various negotiating sessions, is not sufficient to carry the burden of establishing the Club Owners' proposed findings in regard to an established meaning of the words "reserve system" by the weight of the credible evidence. Indeed, we expressly find that the weight of the credible evidence supports a finding directly contrary to the Club Owners' proposed findings in this area.

We reject the Club Owners' proposed findings 20 and 21 for the reason that we would find as a fact that neither Marvin Miller nor any other representative of the Players Association acquiesced in either the "reserve system" or that the Players Association in any way agreed that Article XIV of the 1970 Basic Agreement or Article XV of the 1973 Basic Agreement was to be considered as an exclusionary clause which would bar the bringing of any grievance which could properly be considered under the provisions of Article X of the 1970 and 1973 Basic Agreements.

Proposed findings 31, 32, 35, and 36 involve mixed questions of fact and law which are rejected for the reasons we shall later state in our discussion of the legal questions presented. Club Owners' proposed findings 33 and 34 relate to the position taken by the parties in connection with other grievances heard pursuant to the arbitration clauses contained in the 1970 and 1973 Basic Agreements. Those likewise will be discussed hereinafter.

## IV.

The Club Owners, on page 7 of their final trial brief, cite *Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), to support their argument that the principles stated in the *Steelworkers* trilogy,[9] hand-

---

8. The record in this case establishes that many proposals made by the Players Association, which no one has contended could conceivably involve even the "periphery" of the "Reserve System" were rejected by the Club Owners because discussion of such a nonreserve system proposal would "affect the bloodstream of the industry." See page 155 of Mr. Hadden's notes of Mr. Gaherin's report of the reaction concerning the Players Association proposal in regard to the scheduling of games, clearly a matter unrelated to the "Reserve System". Mr. Gaherin reported that the Club Owners had been "astounded at the magnitude" of the proposal which they believed would "affect the bloodstream of the industry and its income."

9. *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

ed down by the Supreme Court in 1960, are somehow not applicable to this case. We agree that *United Mine Workers* is the latest controlling decision of the Supreme Court. We disagree that what was said in that case did anything other than reaffirm the principles articulated in the *Steelworkers* trilogy.

The question presented in *United Mine Workers* was whether a separate provision in the collective bargaining agreement, outside the arbitration clause, when considered in light of § 502 of the Labor Management Relations Act, 29 U.S.C. § 143, could properly be construed to exclude mine safety disputes which might endanger the lives of the miners from the coverage of the general arbitration clause in the agreement. The District Court held that the principles stated in the *Steelworkers* trilogy applied and ordered arbitration. The Third Circuit reversed, 466 F.2d 1157. The Supreme Court determined that the District Court was right in the first place in applying the usual federal policy favoring arbitration of labor disputes, even though the questions concerned the safety of men in the mines.

Mr. Justice Powell, speaking for all members of the Court except Mr. Justice Douglas, the sole dissenter,[10] concluded on the facts that the arbitration clause involved in the collective bargaining agreement "appears sufficiently broad to encompass the instant dispute . . . On its face, this contractual language admits of only one interpretation: that the agreement required the union to submit this dispute to arbitration for resolution by an impartial umpire." [Id. at 376, 94 S.Ct. at 636 (emphasis ours)]. The Court then stated that the Third Circuit had attempted to place a limitation upon the established federal pre-

sumption of arbitrability on the theory that such presumption was overcome by a public policy against forcing miners to stake their lives on the judgment of an arbitrator, however impartial he may be. In stating its disagreement with the Third Circuit, the Supreme Court concluded that:

The federal policy favoring arbitration of labor disputes is firmly grounded in congressional command. Section 203(d) of the Labor Management Relations Act, 29 U.S.C. § 173(d), states in part:

Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement.

In the *Steelworkers* trilogy, this Court enunciated the now well-known presumption of arbitrability for labor disputes:

An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage. *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–583, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960).

The Court also elaborated the basis for this policy. It noted that commercial arbitration and labor arbitration have different objectives. In the former case, arbitration takes the place of litigation, while in the latter "arbitration is the substitute for industrial

---

10. Mr. Justice Douglas, of course, was the author of all three of the Court's opinions in the 1960 *Steelworkers* trilogy. His 1974 dissenting opinion in *United Mine Workers* stated that "It is, of course, clearly established that because of congressional policy favoring arbitration of labor disputes, a general arbitration provision, as found in the agreement here in question, is broadly construed [citing the

*Steelworkers* trilogy]. This policy is grounded, as the majority points out, in the expression of policy by the Labor Management Relations Act." [414 U.S. at 390–91, 94 S.Ct. at 643.] It is therefore obvious that all members of the Court, including Mr. Justice Douglas, agreed with what Mr. Justice Powell said in that portion of *United Mine Workers*, which we shall later quote in the text.

strife." *Id.*, at 578, 80 S.Ct., at 1351. A collective-bargaining agreement cannot define every minute aspect of the complex and continuing relationship between the parties. Arbitration provides a method for resolving the unforeseen disagreements that inevitably arise. [*Id.* at 377–78, 94 S.Ct. at 636–37.]

The Supreme Court concluded that " 'the presumption of arbitrability' announced in the *Steelworkers* trilogy applies to safety disputes, and that the dispute in the instant case is covered by the arbitration clause in the parties' collective-bargaining agreement." [*Id.*, at 379–380, 94 S.Ct., at 638.]

Footnote 10, appended to the sentence just quoted from *United Mine Workers*, shows that the party resisting arbitration in that case, as the Club Owners resist arbitration in this case, argued that another provision in the collective-bargaining agreement outside the arbitration clause should be read to limit the jurisdiction of the impartial arbitrator and therefore exclude the dispute from arbitration. In rejecting that notion, the Court stated:

> The Court of Appeals also found support for its refusal to order arbitration in § (e) of the collective-bargaining agreement. Section (e) provides for an employee mine safety committee empowered to inspect mine facilities and equipment and to report its findings to the management. If the committee finds an "immediate danger," it may make a binding recommendation to remove all workers from the unsafe area.
>
> Although the Court of Appeals did not state that § (e) was an express exception to the arbitration clause, it evidently believed that the section created an ambiguity in the agreement which had to be resolved against arbitrability. However, as the Court stated in *United Steelworkers of America v. Warrior & Gulf Navigation Co., supra*, "[d]oubts should be resolved in favor of coverage." 363 U.S., at 583, 80 S.Ct., at 1353. Thus, "[i]n the absence

of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad." (*Id.*, at 584–585, 80 S.Ct., at 1354.) Since § (e) clearly does not constitute an express exception to the arbitration clause, it follows that the safety dispute in the instant case must be deemed to fall within the broad arbitration clause. [*Id.* footnote 10]

The Supreme Court reiterated in *United Mine Workers* well-established and familiar principles of federal labor law of at least fifteen years standing when it decided that case in 1974. Those principles require all lower federal courts, and all parties to collective-bargaining agreements made by employers and employees engaged in a business which affects commerce, to recognize that (1) the federal policy which favors arbitration of labor disputes is grounded in the command of Section 203(d) of the Labor Management Relations Act; (2) that principles applicable to commercial arbitration, which seek only to avoid litigation, are different from those applicable to labor arbitration, which provide a substitute for industrial strife; (3) that the *Steelworkers* trilogy enunciated what is now an established presumption of arbitrability of all labor disputes and grievances which can be said to be within the coverage of a particular arbitration clause; (4) that an order to arbitrate may not properly be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute; (5) that doubts should be resolved in favor of coverage by an arbitration clause; (6) that any ambiguity which may be said to be created by some clause in a collective bargaining agreement which appears outside the arbitration clause itself may not properly be resolved against arbitrability; (7) that in the absence of any express provision excluding a particular grievance from arbi-

tration, the Supreme Court requires that a party to a collective bargaining agreement who seeks to resist arbitration be under a duty to establish a purpose to exclude the claim by the most forceful evidence; and (8) that the forceful evidence rule is particularly applicable where the exclusion clause is vague and the arbitration clause quite broad.

We find and conclude under the particular circumstances of this case (a) that the arbitration clause set forth in Article X of the controlling 1973 Basic Agreement is quite broad within the meaning of the principles reiterated in United Mine Workers; (b) that consistent with, but not governed by, the finding of Impartial Arbitration Chairman Seitz, Article XV is not an express provision which can properly be said to exclude the particular grievances involved in this case; (c) that Article XV cannot properly be considered an exclusion clause at all; (d) that even if it could be assumed for purposes of argument that Article XV could be said to be a vague clause, a finding and conclusion which we expressly reject, the Club Owners have not adduced any forceful evidence to establish a purpose to exclude the grievances involved in this case; indeed, if it were appropriate to make a finding in regard to such a question, we would find and conclude that the weight of the credible evidence establishes that the parties did not, in fact, establish a purpose to exclude the Messersmith and McNally grievances from the scope and coverage of the arbitration clause agreed upon in Article X of the 1973 Basic Agreement.

In response to a direct question by the Court to both parties in regard to "whether in the absence of Article XV, the Messersmith and McNally grievances would have been within the scope and coverage of the Arbitration Clause as agreed to in Article X of the 1973 Basic Agreement" [Tr. 95–96], the Club Owners, after giving the question full consideration over a noon recess, candidly stated that it was the Club Owners' position that "assuming that Article XV was not in the agreement . . . we agree that the grievances submitted by Messersmith and McNally would have been within the terms of [Article X]." [Tr. 100] [11] It is therefore apparent that we must, under the mandate of the principles enunciated in United Mine Workers, find and conclude that the presumption of arbitrability is applicable to this case, and that appropriate recognition must be given to the undisputed and conceded fact that the Messersmith and McNally grievances are in fact covered by the language of Article X of the 1973 Basic Agreement, and that it therefore cannot be said that the arbitration clause is not susceptible of an interpretation that covers the grievances involved in this case. We further find and conclude that no ambiguity is created by the language of Article XV of the 1973 Basic Agreement and that even if it could be said that some sort of an ambiguity is present in this case, any doubt created by an assumed ambiguity must be resolved in favor of coverage.

Application of established principles of federal labor law requires that we find and conclude that the parties were under obligation to submit the Messersmith and McNally grievances to arbitration, and that the Arbitration Panel established under Article X of the 1973 Basic Agreement had jurisdiction to hear and decide the grievances.

### V.

The second question presented to this Court is whether, as prayed for in its amended counterclaim, the Players Association is entitled to an order specifically enforcing the Award of the Arbitration Panel. As may be noted in footnote 3,

11. The Players Association, of course, was of the same view [Tr. 104–105]. In its response to the Court's question, counsel for the Players Association accurately pointed out that the Club Owners, on pages 723–724 of the tran-script of the proceedings before the Arbitration Panel, conceded that except for their Article XV argument, the grievances were clearly within the coverage of Article X.

the Club Owners' statement of the second question did not relate directly to the prayer of the Players Association's amended counterclaim. Rather, the Club Owners' position in regard to the second question implicitly assumes that this Court has power to set aside the Award, decide the Messersmith and McNally grievances on the merits, and, in effect, enter a new award consistent with the Club Owners' interpretation and construction of paragraph 10(a) of the Uniform Players Contract.

Consistent with that implicit assumption, the Club Owners' stated position in regard to the second question was directed against the Impartial Arbitrator and what he said in his Opinion rather than against the Award. The Club Owners contend in that connection that it was the Impartial Arbitrator, rather than the Panel, who allegedly exceeded the power conferred upon the Panel by the 1973 Basic Agreement in that, according to the Club Owners' argument, it was the Impartial Arbitrator who imposed "his own philosophy and personal brand of industrial justice in disregard of the plain meaning and century old practice of the baseball reserve system."

█ The Award, which the Players Association seeks to have enforced, is the Award of an Arbitration Panel established as agreed by the parties in the 1973 Basic Agreement. It is, of course, true that the Impartial Arbitrator had the deciding vote on the Panel, but it is important to recognize that this Court, under applicable federal labor law, does not sit as an appellate court to review the merits of the grievances submitted to arbitration panels established by collective bargaining agreements or to review the opinions of impartial arbitrators which may be written under the circumstances of a particular case. The parties' collective bargaining agreement in this case, as is usually the case, does not require either the Panel or the Impartial Arbitrator to write any opinion in support of its Award.

The obvious unhappiness of the Club Owners with the Impartial Arbitrator and what he said in his Opinion, however, is so great that in this case the Club Owners direct the initial fire of their legal argument, as reflected by their stated position at the outset of the case and by their conclusions of law proposed at the end of the case, to mounting a preliminary attack on the Impartial Arbitrator and his Opinion. The thrust of that primary attack, however, reflects but a first step in the Club Owners' attempt to have this Court review the merits of the grievances and to interpret and construe the collective bargaining agreement of the parties, including but not limited to paragraph 10(a) of the Uniform Players Contract, in a manner different from the construction and interpretation made by the Arbitration Panel.

The Club Owners' proposed conclusions of law 22 through 27, for example, suggest that this Court conclude as a matter of law that "the *arbitrator* exceeded his powers in determining that (a) the Club's Reserve System is incompatible with the doctrine or policy of freedom of contract in the economic and political society in which we live [Club Owners' proposed conclusions of law, paragraph 22 (emphasis ours)]; (b) the clubs could not reserve a player 'absent a contractual tie' [*Id.,* paragraph 23]; (c) the Los Angeles Dodgers could not reserve John A. Messersmith [*Id.,* paragraph 24]; (d) the Montreal Expos could not reserve David A. McNally [*Id.,* paragraph 25]; (e) the reservation of the Los Angeles Dodgers of John A. Messersmith was 'unavailing and ineffectual' and directing said Club to remove his name from its reserve list [*Id.,* paragraph 26]; and (f) the reservation by the Montreal Expos of David A. McNally was 'unavailing and ineffectual' and directing said Club to remove his name from its reserve list" [*Id.,* paragraph 27].

Club Owners' proposed conclusions of law 17, 19 and 20 are proposed on the apparent theory that the initial barrage upon the Impartial Arbitrator and his

Opinion,[12] as mounted in paragraph 22 through 27 of the Club Owners' proposed conclusions of law, will have been successful, and that this Court would accordingly consider the merits of the grievances and thereafter accept the construction and interpretation of the collective bargaining agreement as stated in Club Owners' proposed conclusions 17, 19 and 20.

Paragraph 17 of the Club Owners' proposed conclusions of law directly and flatly involves the merits of the grievances determined by the Panel and proposes that this Court conclude, as a matter of law, that:

12. The Club Owners' brief in support of its proposed conclusions of law is replete with general charges that, for example, "the arbitrator arrogated to himself jurisdiction of the purported grievances . . . . determined that the historic Reserve System was something quite different from what everyone had thought it was [and] with a stroke of a pen . . . adopted a baseless and disingenuous 'theory' of the Association . . . fundamentally upsetting baseball's status quo and putting at risk millions of dollars." [page 2] In a footnote on page 10 of its brief, the Club Owners state that "the Reserve System has been destroyed, as utterly as if by antitrust decree [and that] if the arbitrator's award is permitted to stand, the clubs will have lost— by a spurious and arrogant theory of contract 'interpretation'—the very thing they successfully defended in *Flood*."

On page 38, the Club Owners have lifted the "philosopher king" words out of the opinion in *Torrington Company v. Metal Products Workers Union Local 1645*, (2d Cir. 1966) 362 F.2d 677, and used that language out of context in order to charge the Impartial Arbitrator with having "improperly sought to become a 'philosopher-king' and adopted his own views as to how baseball should operate." On page 45 of the Club Owners' brief, it is charged that the arbitrator had stated "his own personal prejudice without authority or precedent to support his extra-legal views." On page 46, without specification or particularity, it is charged that "the arbitrator in his decision mis-stated indisputable facts, ignored massive and conclusive evidence contrary to his desired conclusion and indicated nothing less than an obsessive desire to change (rather than interpret) the rules of the game by imposing upon the Clubs his own personal brand of industrial justice." And on page 47 it is stated that "Upon analysis, it is apparent that the arbitrator's arguments amount to nothing

17. While paragraph 9(a) of the Uniform Players Contract provides that the players "agree to accept and abide by and comply with the Major League Rules," it does not incorporate such rules into the Uniform Players Contract.[13]

The Club Owners proposed in their conclusion of law 19 that this Court, after it interprets and construes paragraph 9(a) of the Uniform Players Contract in a manner diametrically opposed to the construction and interpretation made of that paragraph by the Panel, should then go further in its review of the merits of the grievances and conclude, as a matter of law, that "The effect of Rules 4–A, more than a sham attempt to rationalize the conclusion he reached initially—that he did not like the Reserve System and wanted to change it."

Because of the implicit findings of fact requested by the Club Owners in connection with the charges made in support of their proposed conclusions of law, we deem it appropriate to expressly state that this Court can find nothing in any of the words spoken by the Impartial Arbitrator during the hearing conducted by the Panel, in the manner in which the arbitration proceedings were conducted, or in either the Opinion or the Award which can fairly be said to support the charge that Mr. Seitz did anything other than discharge the duties imposed upon him by Article X of the 1973 Basic Agreement with the highest sense of fidelity, responsibility and intelligence.

13. To keep in perspective the Club Owners' argument on the merits of the grievance in regard to how paragraph 9(a) of the Uniform Players Contract should be interpreted and construed, it is to be noted only in passing, for we shall not reach the merits of the grievances, that paragraph 9(a) of the Uniform Players Contract commences with the following language:

> The Club and the Players agree to accept, abide by and comply with all provisions of *the Major League Agreement,* the Major League Rules, *the Rules and Regulations of the League of which the Club is a member, and the Professional Baseball Rules, in effect on the date of this Uniform Player's Contract.* [Emphasis supplied]

The portions of paragraph 9(a) of the Uniform Players Contract which are underlined for italics are not included in Conclusion of Law 17, which the Club Owners proposed that this Court make on the merits of the grievances involved in this case.

3(g), 15 and the related rules is to permit each club perpetually to reserve—as against the other clubs—those players who last played for it." [14]

Paragraph 20 of the Club Owners' proposed conclusions of law, consistent with the pattern of 17 and 19, proposes a conclusion which also goes to the merits of the grievances in that it proposes that we conclude as a matter of law that "[H]aving a player under contract or acceptance of terms is not a precondition to a club's right to reserve a player." That proposed conclusion of law obviously calls for a construction and interpretation of the collective bargaining agreement of the parties, including but not limited to the Uniform Players Contract, a construction and interpretation which the Panel refused to accept after giving appropriate consideration to all arguments presented to it by the parties to the arbitration proceeding. In short, Club Owners' proposed conclusion 20, much as do proposed conclusions 17 and 19, simply proposes that this Court review the merits of the grievances presented to the Panel and reverse the Award made by it.

Application of principles of federal labor law enunciated in the *Steelworkers* trilogy generally, and most specifically in *United Steelworkers of America v. Enterprise Wheel & Car Co.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), requires that all of the Club Owners' proposed conclusions of law under discussion (22 through 27, inclusive, and 17, 19 and 20) must be refused and expressly rejected by this Court.

The Club Owners' preliminary charge that the Impartial Arbitrator was bent on dispensing "his own brand of industrial justice" is an obvious attempt to have this Court read those words in a different sense than they were used in *Enterprise*. For it is to the Supreme Court's decision in *Enterprise* that we must look in considering the question of whether the Players Association is entitled to an order of this Court specifically enforcing the Award of the Arbitration Panel in regard to the Messersmith and McNally grievances.

*Enterprise* clearly determined the question of whether a court or an arbitration panel has the final say in regard to the merits of an award rendered and the extent of relief granted by an arbitration panel. Consistent with the rationale of the other two cases in the *Steelworkers* trilogy, the Supreme Court determined in *Enterprise* that:

> The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards. [Id. at 596, 80 S.Ct. at 1360.]

The Supreme Court stated that the pervasive federal policy favoring arbitration of labor disputes was based in part on the recognition that:

> When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. [Id. at 597, 80 S.Ct. at 1361.]

*Enterprise* teaches that ambiguities which may appear in an opinion of an arbitrator must be viewed in the same manner as ambiguities which may arise in regard to whether a particular griev-

---

14. Neither conclusion of law 19 nor any other conclusion of law proposed by the Club Owners identify the other "related rules" the Club Owners contend would permit "each club perpetually to reserve—against other clubs—those players who last played for it." Although the Club Owners adduced a great deal of testimony before the Panel and this Court in regard to the "periphery" or the "core" or "guts" of the "Reserve System," none of the Club Owners' proposed conclusions of law contain any reference to those words.

ance is within the scope of the particular arbitration clause of a collective bargaining agreement. Judicial doubts in either instance must be resolved in favor of the arbitration procedures and the opinion of the arbitrator. *Enterprise* held that:

> A mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award. Arbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions. This would be undesirable for a well-reasoned opinion tends to engender confidence in the integrity of the process and aids in clarifying the underlying agreement. [*Id.* at 598, 80 S.Ct. at 1361.]

*Enterprise* further noted that "plenary review by a court of the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final."

Article X of the 1973 Basic Agreement provides, as do arbitration clauses in many collective bargaining agreements, that "[T]he decision of the Arbitration Panel shall constitute full, final and complete disposition of the Grievance appealed to it." In spite of all the statements of record and testimony in this case in regard to the difficulty and impracticability of attempting to litigate and to negotiate a new collective bargaining agreement simultaneously, it is quite clear that this case will shortly be on its way to the Court of Appeals and,

possibly, to the Supreme Court, before anyone will consider the decision of the Arbitration Panel to be a "full, final and complete disposition" of the Messersmith and McNally grievances.[15]

*Enterprise* stated that the Court had emphasized in one of the other *Steelworker* cases, *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960) and it was therefore to be reiterated in *Enterprise* that:

> The question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his. [*Id.* at 599, 80 S.Ct. at 1362.]

 Under the command of *Enterprise*, we have not given any consideration to whether we would have interpreted the Uniform Players Contract and other portions of the collective bargaining agreement of the parties involved in this case in the same manner as did the Arbitration Panel. For the Supreme Court of the United States has determined that "courts have no business overruling [an arbitrator's decision] because their interpretation of the contract [may be] different from his." [*Id.*] This is not to say that if it were the business of this Court to consider the merits of the grievances involved in this case we would come to a conclusion different from that of the Arbitration Panel. It is

---

**15.** We have, of course, long ago recognized that neither this nor any other court can do anything about that. See pages 22 to 24 of the transcript of the January 8, 1976 proceedings in this case, where we made reference to what we wrote more than ten years ago in *Greater Kansas City Laborers District Council v. Builders' Association of Kansas City* (W.D. Mo.1963) 213 F.Supp. 429, 433; *aff'd* 326 F.2d 867 (8th Cir. 1964); *cert. den.* 377 U.S. 917, 84 S.Ct. 1182, 12 L.Ed.2d 186 (1964).

Pages 11 through 21 of that January 8, 1976 transcript show that this Court's suggestion

that the parties consider exclusive use of collective bargaining rather than litigation was prompted by the discussion before the Panel which related to the question of whether still further litigation might, under particular circumstances, follow in the wake of an award in favor of the Players Association. Such a possibility, of course, is not a question presently before this Court. Nor do we indicate that such a question may ever be before this Court in connection with the pending litigation.

simply to say that under the applicable federal labor law as declared by the Supreme Court, when the parties to a collective bargaining agreement agree, as the parties in this case did agree in Article X of their 1973 Basic Agreement, that a grievance "which involves the interpretation of, or compliance with, the provisions of any agreement between the Association and the Clubs or any of them or any agreement between a Player and a Club . . . [shall be submitted to arbitration and that] the decision of the Arbitration Panel shall constitute full and complete disposition of the Grievance appealed to it," the parties are entitled to that decision. The parties did not bargain for the decision of this or any other court. Under the law as stated in *Enterprise*, it would not be proper for this Court to state how it would have decided the merits of the grievances involved in this case if it had been acting as the Impartial Arbitrator.

It is therefore appropriate that we find and conclude (1) that the Arbitration Panel had jurisdiction of the grievances under Article X of the 1973 Basic Agreement; (2) that there is no evidence that the Panel exceeded the jurisdiction conferred upon it by the agreement of the parties; and (3) that the Award rendered by the Panel drew its essence from the collective bargaining agreement, and was within the lawful range and jurisdictional power of the Panel to formulate the particular remedy it deemed necessary to enforce its decision. We accordingly find and conclude that the Players Association is entitled to an appropriate order of this Court specifically enforcing the Award.

Because of the apparent inevitability of appeal, we shall in the next part of this opinion discuss the circumstances under which evidence was adduced before this Court which was not adduced before the Panel. We shall then state additional formal conclusions of law and indicate which conclusions of law proposed by the parties are approved and which are rejected. The final part of this opinion will direct further proceedings in connection with the final order and judgment of this Court.

## VI.

The evidence adduced at the three-day hearing in this Court added very little, if anything, of relevant and material substance to the evidence adduced before the Panel. Section 301 cases to compel arbitration or to enforce arbitration awards infrequently involve disputed questions of fact.[16]

Discussion at the pretrial conference held January 19, 1976, convened shortly after it became apparent that the Court might conceivably be faced with "a battle of affidavits" in its determination of this case, established that there were mountains of notes taken by participants in the various meetings and negotiations of which opposing counsel had no prior knowledge and which had not been introduced in evidence before the Arbitration Panel. Consistent with standard pretrial procedures in this Court where questions involving the reconstruction of past events are involved and where it becomes apparent that contemporaneously recorded documentary evidence is in existence, the following agreed order was entered, page 36 of the transcript of the January 19, 1976 conference:[17]

In connection with and in preparation for the plenary evidentiary hear-

---

16. *Builders' Ass'n of Greater Kansas City*, supra; *Oil, Chemical and Atomic Workers' International Union, Local 5–348 v. Great Lakes Pipe Line Company*, No. 14771 (unreported, 1964); *Communication Workers of America v. American Telephone and Telegraph*, No. 18927 (unreported, 1972); and *American Fed. of TV & Radio Art. v. Taft Broad. Co., WDAF*, (W.D. Mo.1973) 368 F.Supp. 123, are all examples of Section 301 cases decided by this Division of this Court on the basis of a full stipulated record.

17. See *United States v. Nygard*, 324 F.Supp. 863, 867 (W.D.Mo.1971), footnote 3, where reference is made to the necessity of assembling all relevant and material contemporaneous documentary evidence in connection with a hearing of a pretrial motion to suppress evidence in a criminal case. This case was discussed with counsel at the January 19, 1976 pretrial conference in this case.

ing, the parties have agreed that on or before January 22, 1976 copies of all notes made contemporaneously by any persons who participate in the meetings and negotiations just stated will be furnished to the Court and furnished to opposing counsel.

As the record shows, counsel exchanged copies of the notes and provided the Court with all notes. We were therefore able to review and index approximately three inches of Richard M. Moss' handwritten notes produced by the Players Association and approximately nine inches of Club Owners' notes which included former American League general counsel Alexander H. Hadden's 278 page notebook and the notes of Messrs. Louis Hoynes, general counsel for the National League; James P. Garner, general counsel for the American League; John Gaherin, of the Players Relations Committee of the Major Leagues; and Barry Rona, counsel for the Players Relations Committee, before the three-day hearing commenced in this Court on January 26, 1976.

Our review of the proceedings before the Arbitration Panel had established that although Mr. Moss, as counsel for the Players Association before the Panel, and Messrs. Hoynes, Garner and Rona, who appeared as counsel for the Club Owners before the Panel, did discuss isolated portions of a very limited number of pages of contemporaneously recorded notes and documents attached thereto, the notes taken by six participants at the various 1969 Joint Study meetings and at the negotiating sessions leading up to the 1970 and 1973 Basic Agreements had not been introduced in evidence before the Panel.

The transcript of the proceedings before the Panel also demonstrates that the Club Owners did not call as witnesses before the Panel any of the persons who had made contemporaneous notes of the various meetings and negotiating sessions, although all of those persons were apparently present during the proceedings before the Panel. While it is true that Mr. Miller took no permanent notes, he did refresh his recollection from Mr. Moss' notes when he testified before the Panel. Mr. Moss, however, was not called as a witness and his notes were not introduced in evidence before the Panel.

Because the Club Owners' action in filing Mr. Hadden's affidavit had opened up the whole question of contemporaneously taken notes, counsel agreed that procedures should be designed in this Court which would remove any mystery about the notes taken by the various participants and also avoid the possibility of remand by an appellate court for further evidentiary hearing.

The parties accordingly prepared and filed exhibits which clearly identified all significant meetings and negotiating sessions at which notes were taken and attached copies of the various written documents which were before the parties during those particular meetings and sessions which either side believed might be relevant or material under the circumstances. The notes made by all participants in those identified meetings and sessions were adduced in evidence as separate exhibits.

Careful consideration of all the data introduced in the form of contemporaneous notes, documents, and all other evidence introduced in this Court which may not have been adduced in evidence before the Arbitration Panel establishes that the evidence introduced in this Court was cumulative in nature and did no more than corroborate, in infinite detail, the evidence adduced before the Panel. The additional and detailed evidence adduced in this Court removes any possible doubt about whether the findings of fact stated in the Opinion of the Impartial Arbitrator were supported by evidence adduced before the Panel.

We find and conclude under the circumstances that it is not necessary to reach any question which may relate to a party's right to call witnesses in a court action who, although available to be called, were not in fact called as witnesses at the arbitration proceeding. In this case, the evidence before this Court,

although more detailed and corroborated by contemporaneous documentary evidence, was the same in substance as the evidence adduced before the Arbitration Panel.

We think that it is significant, however, that there is not the remotest suggestion in all of the voluminous contemporaneous notes made by six participants at the various meetings and negotiating sessions concerning the inclusion of a clause stating that grievances which might relate to the "reserve system" in general, grievances which might relate to the "periphery" of the "reserve system," grievances which might relate to the "core" or "guts" of the "reserve system" or most important so far as this case is concerned, grievances which might relate to the meaning of paragraph 10(a) of the Uniform Players Contract, should be excluded from the coverage of Article X. For it is beyond dispute that the parties knew precisely how to exclude grievances which could arise in regard to a particular paragraph of the Uniform Players Contract. See paragraph 10A.1(c) of Article X of the 1973 Basic Agreement which stated that:

Notwithstanding the definition of "Grievance" set forth in subparagraph (a) above, "Grievance" shall not mean a complaint or dispute which involves the interpretation or application of, or compliance with the provisions of the first sentence of paragraph 3(c) of the Uniform Player's Contract. However, nothing herein shall alter or abridge the rights of the Parties, or any of them, to resort to a court of law for the resolution of such complaint or dispute.

It is not necessary, indeed, it is redundant to recite the detailed history of Article XV of the 1973 Basic Agreement. It is stipulated that the predecessor of that Article appeared as Article XIV in the 1970 Basic Agreement, and that the necessity of Article XIV was suggested to the Players Association by Arthur Goldberg, counsel in the *Flood* litigation, in order to avoid any possibility of prejudicing the *Flood* litigation as a result of

the Association's being charged with having agreed to the Reserve System. It is almost ludicrous to suggest that the Players Association would insist upon placing Article XIV in the 1970 Basic Agreement for the purpose of excluding grievances which it might in the future desire to maintain in regard to the particular paragraphs of the Uniform Players Contract. The documentary history establishes that the Players Association also proposed what is now contained in Article XV of the 1973 Basic Agreement. Certainly it did not purpose that provision in the agreement to deprive itself of the paragraph 10(a) grievances involved in this case.

In light of the foregoing, we find and conclude that all evidence adduced in this Court which had not been adduced before the Panel was cumulative and corroborative in nature and that the evidence before the Panel, standing alone, was more than sufficient to sustain the findings stated by the Impartial Arbitrator in his Opinion, in which he explained the factual circumstances to support the Award of the Panel.

We need add but a short word concerning the other grievances processed pursuant to the grievance procedures in the Basic Agreements of the parties. We find and conclude that evidence concerning other grievances is irrelevant and immaterial in that there is no necessity under the circumstances of this case to make inquiry into the construction the parties may have placed on the scope of the arbitration clause in connection with other grievances. This is particularly true in light of the agreement of the parties that except for the presence of Article XV in the 1973 Basic Agreement, the Club Owners would not even contend that the Messersmith and McNally grievances would not fall within the coverage of Article X of the 1973 Basic Agreement. We further find and conclude that the fact, if it be a fact, that this Court's attention was directed to some grievance to which the Arbitration Panel's attention was not directed has no legal significance or relevancy in regard to any question presented in this case.

## VII.

Consistent with our usual practice, we shall state additional formal conclusions of law and expressly reject other proposed conclusions in direct response to all conclusions of law proposed by all parties. The following conclusions of law were proposed by the Players Association and, while they generally report conclusions of law already stated, they are stated again in the language proposed by the Players Association as that language has been slightly modified to conform with descriptive language used throughout this opinion. We have also made a few modifications of the language proposed by the Players Association in order that all legitimate questions of inconsistency of rationale be eliminated.

1. This Court has subject matter jurisdiction over the Amended and Supplemental Complaint of the Club Owners pursuant to Section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. Section 185, in that said complaint is for violation of a contract between employers and a labor organization representing employees within the meaning of 29 U.S.C. Section 185.

2. This Court has jurisdiction over the First Amended Counterclaim of the Players Association, independently of the Amended and Supplemental Complaint of the Club Owners, pursuant to Section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. Section 185, in that said First Amended Counterclaims are for violation of a contract between employers and a labor organization within the meaning of 29 U.S.C. Section 185.

3. The Club Owners' Amended and Supplemental Complaint, First Cause of Action, prays for a declaratory judgment to the effect that the grievances which are the subject matter of this lawsuit are not subject to the grievance and arbitration provisions of the collective bargaining agreement involved. Such a claim may not be sustained under applicable law, unless this Court could say with positive assurance that the arbitration clause of the collective bargaining agreement is not susceptible of any interpretation that covers the asserted dispute. All doubts must be resolved in favor of arbitrability of the grievances.

4. Based upon the contract and the record presented in this case, this Court cannot say with positive assurance that the arbitration clause of the collective bargaining agreement contained in Article X of the 1973 Basic Agreement is not susceptible of an interpretation which covers the dispute raised by the grievances involved. Indeed, it is conceded that it is, except for the alleged impact of Article XV. Thus, the relief prayed for by the Club Owners in their Amended and Supplemental Complaint, First Cause of Action, cannot be granted.

5. The Club Owners contend that the Award of the Arbitration Panel should be vacated and set aside, while the Players Association submits that it is entitled to an order of this Court specifically enforcing the Award of the Arbitration Panel. In considering this question, this Court cannot review the merits of the substantive disputes that were submitted to the Arbitration Panel. Nor can the Award of the Arbitration Panel be vacated and set aside on the basis that this Court would reach a different conclusion on the merits of the grievances submitted than did the Arbitration Panel. Rather, this Court could properly set aside and vacate the Award of the Arbitration Panel only if that Award fails to draw its essence from the collective bargaining agreement. All doubts, if any, as to the validity of the Award of the Arbitration Panel must be resolved in favor of the validity of the Award.

6. Based upon the record presented in this case, this Court is convinced and therefore concludes that the Award of the Arbitration Panel draws its essence from the collective bargaining agreement.

7. Accordingly, the Award of the Arbitration Panel cannot be vacated and set aside and must be enforced. The prayer of the Club Owners' Amended

and Supplemental Complaint, Second Cause of Action, must be denied. The relief prayed for by the Players Association in its First Amended Counterclaim will be granted. The Club Owners will be ordered and directed to specifically comply with the Award of the Arbitration Panel in all particulars and respects.

The Club Owners submitted twenty-nine proposed conclusions of law for our consideration. In order that the record be clear for purposes of appellate review, we shall state our view in regard to the Club Owners' proposed conclusions of law.

Paragraphs 1 through 5, inclusive, which relate to the status of the parties and the jurisdiction of this Court in this case, are correct statements of the law and, in substance, duplicate similar conclusions proposed by the Players Association which we have stated above. It is not necessary to repeat those proposed conclusions. We do, however, state our approval and express acceptance of the first five paragraphs in the language proposed by the Club Owners.

We refuse and expressly reject all other conclusions of law proposed by the Club Owners, as contained in· the remaining paragraphs 6 through 29, inclusive, of the Club Owners' proposed conclusions for the reasons heretofore stated.[18]

### VIII.

For all of the reasons stated, it is

Ordered (1) that the prayer for declaratory judgment relief prayed for in the Club Owners' Amended and Supplemental Complaint should be and the same is hereby denied. It is further

Ordered (2) that the prayer of the Players Association's first amended counterclaim should be and the same is hereby granted. It is further

Ordered (3) that, pursuant to Rule 58 of the Federal Rules of Civil Procedure,

we direct that the Clerk shall not prepare the final judgment and decree in this case but shall await further direction of this Court in connection therewith. It is further

Ordered (4) that counsel for the Players Association shall promptly prepare what it deems to be an appropriate final judgment and decree specifically enforcing the Award of the Arbitration Panel and submit the same for approval as to form to counsel for the Club Owners. If Players Association's proposed final judgment and decree is approved as to form by counsel for the Club Owners, counsel for the Players Association shall promptly present the same to this Court for its consideration and approval. It is further

Ordered (5) that in the event counsel for all parties are not able to agree upon a proposed form of final judgment and decree, counsel shall be prepared to appear before the Court for resolution of any disagreements which may arise on Saturday morning, February 7, 1976, or at such earlier time as may be conveniently scheduled with the assistance of the Court's law clerks. If Club Owners anticipate seeking any stay of execution of the final judgment and decree as finally entered by this Court, all motions and papers deemed necessary for filing in that connection shall be prepared and served upon opposing counsel with copies to the Court, before the time an approved final judgment and decree is presented to this Court for its consideration and approval.

We are confident that counsel will continue to cooperate with each other and with this Court so that appropriate procedures may be designed to give all parties whatever hearing they may desire under the circumstances, the same to be held not later than Saturday, February 7, 1976.

---

**18.** Paragraphs 6 through 10, inclusive, which have not been heretofore discussed, propose conclusions which relate solely to an interpretation and construction of the "does not deal with the reserve system" language in Article XIV of the 1970 Basic Agreement. Those paragraphs are refused and expressly rejected because this case involves the rights of the parties to arbitration under the 1973 Basic Agreement, not the 1970 Basic Agreement.

MEMORANDUM AND ORDER GRANTING CLUB OWNERS' MOTION TO BE EXCUSED AND DIRECTING THAT CLERK ENTER FINAL JUDGMENT AND DECREE

█ This case pends on the Club Owners' motion to be excused from any requirement of approval of the judgment to be entered in this case, either as to form or substance. That motion will be granted for reasons we shall state. In accordance with procedures agreed upon at a conference with counsel held during the noon hour on February 6, 1976, we shall direct the Clerk to enter the Final Judgment and Decree in this case.

The files and records in this case reflect that on February 3, 1976, after finding that the Players Association's first amended counterclaim should be granted, we entered an order which directed that counsel for the Players Association promptly prepare what they believed to be an appropriate Final Judgment and Decree, specifically enforcing the Award of the Arbitration Panel and to submit the same to counsel for the Club Owners for approval as to form.

Other orders issued February 3, 1976 provided that if counsel for both sides were unable to agree upon the form of the Final Judgment and Decree proposed by the Players Association, the Court be so advised in order that any disagreement would be resolved before the Court on Saturday morning, February 7, 1976.

The Court was advised early Friday morning, February 6, 1976, that counsel for the Club Owners could not agree on the form of the Final Judgment and Decree proposed by the Players Association. Counsel for Club Owners also advised the Court that they wished to be excused from any requirement that they approve either the form or substance of the Final Judgment and Decree to be eventually entered by this Court. The pending motion to be so excused was filed later that same day.

The Court accordingly met with counsel for both sides on Friday, February 6, 1976, during the noon recess of another case then on trial, and directed further proceedings for the orderly processing of the pending case. Counsel for the Club Owners were advised that the Court would grant their motion to be excused from any requirement that they approve the form of the Final Judgment and Decree proposed by the Players Association.

The Court advised counsel that it would notify both sides as soon as possible in regard to whether it would approve the form of Final Judgment and Decree as proposed by the Players Association and that, thereafter, an appropriate schedule would be agreed upon in regard to (1) the filing of the Final Judgment and Decree; (2) in filing of the Club Owners' notice of appeal; (3) the filing of the Club Owners' Rule 62(c) motion for a stay pending appeal; and (4) the Court's ruling of the Club Owners' Rule 62(c) motion.

Counsel for the Club Owners commendably agreed to submit to the Court early Saturday morning a first draft of their brief in support of their contemplated Rule 62(c) motion for a stay with the understanding that they would be afforded an opportunity later to supplement that brief after they had been advised of whether the Court would approve and eventually enter a Final Judgment and Decree in a form substantially the same as that proposed by the Players Association.

The Court received the draft of the Club Owners' Rule 62(c) brief Saturday morning. After carefully considering that brief and the Players Association's proposed Final Judgment and Decree, we advised counsel for both sides by telephone at approximately 3:30 p. m. on Saturday afternoon, February 7, 1976, that a Final Judgment and Decree would be entered in substantially the same form as that proposed by the Players Association.

The Court carefully considered the form of Final Judgment and Decree proposed by the Players Association, together with a suggested amendment stated in a letter from Mr. Fehr, hand-delivered

on February 6, 1976, over the weekend. On Monday morning, February 9, 1976, we transmitted to counsel for both sides a form of Final Judgment and Decree which we believed to be proper under the circumstances of this case.

In our letter of transmittal we advised counsel that we had adopted, with modifications only as to form, all four paragraphs proposed by the Players Association in its proposed form but that we had added new paragraphs to avoid possible procedural complications concerning Rule 65(d) of the Rules of Civil Procedure, as discussed in *International Longshoremen Association, Local 1291 v. Marine Trade Association,* 389 U.S. 64, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967), and that we had added a final paragraph to avoid possible procedural complications which might arise in connection with the Club Owners' exercise of their right of appeal.

We advised counsel that we had also, as we deemed to be required by *Marine Trade Association*'s construction of Rule 65(d), added an appropriate reference in the Final Judgment and Decree to Section 401, Title 18, United States Code, and to Rule 42(b) of the Federal Rules of Criminal Procedure, in connection with the jurisdiction of this Court and the procedures to be followed in connection with the enforcement of the Award of the Arbitration Panel and the Final Judgment and Decree of this Court.

Club Owners were not requested, and they have not made any suggestion in regard to the Final Judgment and Decree forwarded to them on Monday, February 9, 1976. Players Association has given the Court the benefit of their view. The form of the Final Judgment and Decree which we shall direct the Clerk to enter is attached hereto.

Accordingly, it is

Ordered (1) that Club Owners' motion to be excused from any requirement of approval of any judgment entry, either as to form or substance, should be and the same is hereby granted. It is further

Ordered (2) that pursuant to Rule 58(2) of the Federal Rules of Civil Procedure, the form of the Final Judgment and Decree attached hereto should be and the same is hereby approved. The Clerk is hereby directed to enter, as a separate document, the attached Final Judgment and Decree.

## FINAL JUDGMENT AND DECREE

The above-entitled action having come on for full trial before the Court, the Honorable John W. Oliver, United States District Judge, presiding, the issues having been duly heard, and a decision having been duly rendered by the Court, final judgment and decree is hereby entered as follows:

I. Final judgment and decree is entered in favor of the Defendant [Players Association] and against the Plaintiff and each Plaintiff-Intervenor [Club Owners] on the Amended and Supplemental Complaint of the Plaintiff and Plaintiffs-Intervenors [Club Owners], including the First Cause of Action and Second Cause of Action thereof; and the said Amended and Supplemental Complaint is dismissed on the merits.

II. Final judgment and decree is entered in favor of the Defendant [Players Association] and against the Plaintiff and each Plaintiff-Intervenor [Club Owners] on the First Amended Counterclaims of the Defendant [Players Association].

III. The Plaintiff and each Plaintiff-Intervenor [Club Owners], and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of this Final Judgment and Decree by personal service or otherwise, are specifically enjoined and directed to affirmatively comply in all particulars and respects with the Award of the Arbitration Panel rendered on December 23, 1975, which Award provides in full as follows:

### AWARD

1. *Jurisdiction:*

It is found and decided that the Messersmith and McNally grievances, despite the claimed effect of the provisions of Article XV of the Basic

Agreement, are within the scope of the provisions of Article X of the Basic Agreement; and, accordingly, are within the duty and the power of the Arbitration Panel to arbitrate. The application of the leagues, made on jurisdictional or procedural grounds, is denied.

2. *The Merits:*

The grievances of Messersmith and McNally are sustained. There is no contractual bond between these players and the Los Angeles and the Montreal Clubs, respectively. Absent such a contract, their clubs had no right or power, under the Basic Agreement, the Uniform Player Contract or the Major League Rules to reserve their services for their exclusive use for any period beyond the "renewal year" in the contracts which these players had heretofore signed with their clubs.

3. *Relief:*

The leagues involved in these proceedings, without delay, shall take such steps as may be necessary to inform and instruct their member clubs that the provisions of Major League Rules 4–A(a) and 3(g) do not inhibit, prohibit or prevent such clubs from negotiating or dealing with respect to employment with the grievants in this case; also, that Messersmith shall be removed from the reserve list of the Los Angeles Club and McNally from the reserve or disqualified lists of the Montreal Club.

On the basis of the present record, the Arbitration Panel denies the Messersmith and McNally grievances to the extent that their respective clubs shall make them whole for any damage suffered by them in the exercise of reserve rights to their services.

The Arbitration Panel retains jurisdiction of the disputes represented by these grievances; but only as to the nature and extent of relief to which the grievants may be entitled under this Award.

IV. Consistent with and pursuant to the requirements of Rule 65(d), Federal Rules of Civil Procedure, it is expressly stated in this final judgment and decree that the reasons for the issuance of this final judgment and decree are fully set forth in this Court's memorandum opinion filed February 3, 1976, which is expressly incorporated in and made a part of this judgment and decree by this reference. It is further expressly stated in accordance with said Rule 65(d) that compliance with the Award of the Arbitration Panel which this judgment and decree specifically enjoins requires that counsel for The National League of Professional Baseball Clubs and counsel for the American League of Professional Baseball Clubs who appeared for and who represented those two leagues before the Arbitration Panel shall immediately notify both leagues that the Award of the Arbitration Panel specifically enforced by this final judgment and decree and the express terms and conditions of this final judgment and decree of this District Court of the United States require that each league shall, without delay, take such steps as may be necessary to inform and instruct their respective member clubs, all of whom are parties to this case, that the provisions of Major League Rules 4–A(a) and 3(g) do not inhibit, prohibit or prevent such clubs from negotiating or dealing with respect to employment with grievants Messersmith and McNally after said grievants Messersmith shall have been removed from the reserve list of the Los Angeles Club and after grievant McNally shall have been removed from the reserve or disqualified lists of the Montreal Club, pursuant to the Award of the Arbitration Panel and the final judgment and decree of this Court.

Counsel for the two leagues who appeared for and who represented those leagues before the Arbitration Panel shall further immediately notify the Los Angeles Club [plaintiff-intervenor Los Angeles Dodgers, Inc.] and the Montreal Club [plaintiff-intervenor Montreal Expos Baseball Club, Ltd.], that the Award of the Arbitration Panel specifically enforced by this final judgment and decree and the express terms and conditions of

this final judgment and decree of this District Court of the United States require that grievant Messersmith be removed from the reserve list of the Los Angeles Dodgers and grievant McNally be removed from the reserve or disqualified lists of the Montreal Club. Plaintiff-Intervenor Los Angeles Dodgers, Inc., shall immediately remove grievant Messersmith from its reserve list. Plaintiff-Intervenor Montreal Expos Baseball Club, Ltd., shall immediately remove grievant McNally from its reserve or disqualified lists.

The Plaintiff and Plaintiff-Intervenors [Club Owners] and their officers, agents, servants, employees, and attorneys, and all those persons in active concert or participation with Plaintiff and Plaintiff-Intervenors [Club Owners] are expressly notified that their failure to comply with the terms and conditions of the Award of the Arbitration Panel and with the terms and conditions of this final judgment and decree of this District Court of the United States will subject them and each of them to appropriate enforcement proceedings, including but not limited to, proceedings authorized by Section 401, Title 18, United States Code, and by Rule 42(b) of the Federal Rules of Criminal Procedure.

V. In order to eliminate any question which may arise in the future in regard to what persons, in addition to the parties to this case, who are or may be bound by this final judgment and decree under the provisions of paragraph III of this final judgment and decree and under the provisions of applicable law, including, but not limited to, Rule 65(d) of the Federal Rules of Civil Procedure, counsel for the Defendant Players Association are hereby ordered and directed to give appropriate actual notice of this judgment and decree, by personal service or otherwise, to which notice there shall be attached a certified copy of this final judgment and decree and a certified copy of this Court's memorandum opinion of February 3, 1976, which is incorporated and made a part of the judgment and decree by reference, to all officers, agents, servants, employees, and attorneys and all other persons whom Defendant Players Association may believe to be in active concert or participation with the Plaintiff and Plaintiff-Intervenors [Club Owners], whom Defendant Players Association believes that it may at some future time contend are or should be bound by this final judgment and decree.

Counsel for the Defendant Players Association shall prepare, serve, and file an appropriate list of all persons other than the parties to this case, to whom it has given actual notice of this final judgment and decree and of this Court's memorandum opinion of February 3, 1976 incorporated herein by reference. Counsel for the Defendant Players Association shall attach to such list a copy of the notice given and shall state the manner in which actual notice was given, whether by personal service or otherwise. Counsel for Players Association may from time to time give actual notice to additional persons and may file additional lists in connection therewith as the circumstances may require.

VI. The costs of this action are taxed against the Plaintiff and Plaintiff-Intervenors [Club Owners] and the defendant [Players Association] shall recover of the Plaintiff and Plaintiffs-Intervenors [Club Owners] its costs of this action.

VII. Jurisdiction of this case is retained only for purposes of enforcement of this judgment and decree. This final judgment and decree is a final decision of this Court within the meaning of Section 1291, Title 28, United States Code.

## MEMORANDUM AND ORDER DENYING CLUB OWNERS' RULE 62(c) MOTION FOR AN ORDER SUSPENDING INJUNCTION DECREE PENDING APPEAL AND ORDER, ON COURT'S OWN MOTION, STAYING EXECUTION OF FINAL JUDGMENT AND DECREE FOR TEN DAYS

### I.

This case pends on Plaintiff's and Plaintiff-Intervenors' [Club Owners] motion for an order under Rule 62(c) of the

Federal Rules of Civil Procedure, suspending the injunction decree pending appeal. That motion prays that this Court's Final Judgment and Decree, entered February 10, 1976, specifically enforcing and directing compliance with the Award of the Arbitration Panel be suspended pending appeal to the Court of Appeals for the Eighth Circuit. The Players Association addressed the question presented in a brief filed last month and filed a supplemental brief on February 10, 1976 in opposition to the Club Owners' pending motion.

The Club Owners, pursuant to agreed procedures, submitted to the Court a draft of its supporting brief on Saturday, February 7, 1976 and filed its final brief on February 10, 1976. We have carefully considered the briefs of the parties and find and conclude that Club Owners' Rule 62(c) motion should be denied.

We shall, however, on our own motion, enter an order granting a ten day stay of execution of the Final Judgment and Decree in order to permit the Club Owners, if they deem such action appropriate, to file an application for stay in the Court of Appeals for the Eighth Circuit, pursuant to Rule 8(a) of the Federal Rules of Appellate Procedure.

## II.

Consistent with counsel's commendable cooperation with the Court throughout this case, both sides have agreed that the principles of law which control this Court's exercise of discretionary power conferred by Rule 62(c) of the Federal Rules of Civil Procedure, were properly enunciated in the most recent decision of the Western District of Missouri, *North Central Truck Lines, Inc. v. United States,* (W.D.Mo.1975) 384 F.Supp. 1188, affirmed by the Supreme Court in 420 U.S. 901, 95 S.Ct. 820, 42 L.Ed.2d 832 (1975). In that case, Chief Judge Becker, sitting on a three judge court composed of Chief Circuit Judge Gibson and Judge Hunter stated:

In exercising that discretion [as provided in Rule 62(c)], the following accepted criteria must generally be considered: (1) the moving party must make a strong showing that success on the merits of the appeal is likely; (2) the party must establish that unless a stay is granted irreparable harm will result; (3) no substantial harm will come to other interested parties; and (4) the granting of a stay would do no harm to the public interest. [*Id.* at 1190–1191.]

The Club Owners contend that each of the four criteria is satisfied. The Players Association contends that none of the criteria has been established. We agree with the Players Association for the reasons we now state in regard to each of the four criteria.

## III.

### SHOWING OF LIKELIHOOD OF SUCCESS ON THE MERITS

The Club Owners confidently state that "seldom, if ever, has there been a case in which the losing party has such a strong likelihood of prevailing on appeal in a case." The Players Association, submits that "there is not even any substantial question presented for appellate review" and that "the Clubs have totally failed to demonstrate that there is any likelihood whatsoever of their success on their presumed appeal of this Court's Final Judgment and Decree specifically enforcing the Award of the Arbitration Panel." We find and conclude under the circumstances of this case that the Club Owners have not made the requisite strong showing that they are likely to succeed on the merits of their appeal for reasons we now state.

The Club Owners' argument is typified by their emphatic quotation of a sentence from *Laundry, Dry Cleaning and Dye House Workers International Union, Local 93 v. Mahoney,* 491 F.2d 1029, 1033 (8th Cir. 1974), *cert. den.* 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 49 (1974), which stated that *"All that is necessary is that the parties make their intent to exclude arbitration clear."* The Club Owners continue to refuse to recognize that the parties to collective bargaining agree-

ments and all lower federal courts must follow the command of the *Steelworkers* trilogy, as most recently reiterated by the Supreme Court in *Gateway Coal Co. v. United Mine Workers,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). *Laundry, Dry Cleaners & Dye House Workers International Union, Local No. 93 v. Mahoney, supra,* was tried on a stipulated record before Judge Collinson of this Court. In that case, the company contended that arbitration of wages and seniority rights were not within the coverage of the grievance and arbitration article of the collective bargaining agreement because Article XX, Section 2 of the agreement provided that wages and seniority rights should be subject to "negotiation." Neither that article, nor any other article in the agreement, however, provided that wages and seniority rights should not be submitted to arbitration in the event negotiation failed.

Judge Collinson ordered the parties to proceed to arbitration. He did not direct publication of his opinion in light of the fact that the case involved routine application of long established principles of federal labor law. In ruling the case, Judge Collinson stated that "Not since the *Steelworkers* trilogy has there been any question that federal labor policy favors the arbitration of disputes. See *United Steelworkers v. American Mfg. Co.,* 363 U.S. 564 [80 S.Ct. 1343, 4 L.Ed.2d 1403]; *United Steelworkers v. Warrior & Gulf Co.,* 363 U.S. 574 [80 S.Ct. 1347, 4 L.Ed.2d 1409]; *United Steelworkers v. Enterprise Corp.,* 363 U.S. 593 [80 S.Ct. 1358, 4 L.Ed.2d 1424]." After quoting appropriate portions of the *Steelworkers* trilogy which set forth what *United Mine Workers, supra,* described as the "well-known presumption of arbitrability," Judge Collinson stated:

> In *Greater Kansas City Laborers District Council of the International Hod Carriers, Building and Common Laborers Union of America of Greater Kansas City and Vicinity v. Builders' Association of Kansas City,* (W.D.Mo.) 213 F.Supp. 429, aff'd. 326 F.2d 867, cert. den. 377 U.S. 917 [84 S.Ct. 1182, 12 L.Ed.2d 186], Judge Oliver summa-

rized the scope of judicial inquiry as established by the *Steelworkers* trilogy as follows at 433:

> Stated simply, our judicial inquiry is "strictly confined" by Congress and the Supreme Court to an examination of the parties' complete intent and our determination of that question is to be aided by our resolution of doubt in favor of coverage, particularly when it can not be said with "positive assurance that the arbitration clause is not susceptible of an interpretation" of coverage and particularly when the parties have not "specifically excluded" the arbitration of the particular difference involved. In the latter situation "only the most forceful evidence of a purpose to exclude" must be present before we can deny coverage. [*Id.* at 4–5]

Judge Collinson applied those principles and ordered arbitration for the reasons that:

> The Court finds on the basis of the evidence before us that neither by express agreement nor by necessary implication is the dispute herein one excluded from arbitration. In the absence of any express provision excluding arbitration of this dispute, and with a lack of "forceful evidence of a purpose to exclude the claim from arbitration" [*Warrior, supra* [80 S.Ct.], at 1353.] . . . this Court concludes that there is no real doubt that the arbitration clause is broad enough to cover this dispute. [*Id.* pp. 7–8]

The Court of Appeals *en banc* affirmed by an equally divided court. Judge Webster, in a separate opinion, concurred with what was stated by Judge Heaney on the issue of arbitrability. Judge Heaney, writing for Judges Lay, Bright and Webster, stated:

> We are convinced, as was the trial court, that it cannot be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute.

\*　　\*　　\*　　\*　　\*　　\*

In summary, we not only fail to find forceful evidence of a purpose to exclude the mid-contract wage dispute from arbitration, but we find evidence of a contrary purpose. The *Warrior* rule is thus triggered. (Fn. 5)

Fn. 5:

The demands of the *Steel Workers* trilogy were recently reiterated in *Gateway Coal Company v. United Mine Workers of America, et al.,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (January 8, 1974), in which a general arbitration clause was held applicable to safety disputes. . . . [491 F.2d at 1032–1033, and n. 5).

In his concurring opinion, Judge Webster added:

I concur in Judge Heaney's opinion on the issue of arbitrability, and in the result.

\* \* \* \* \* \*

The point, it seems to me, is that in this case there is no "clear and unambiguous" evidence of nonarbitrability, and we are bound by the *Steelworkers'* trilogy in such circumstances to hold the issue arbitrable, as Judge Heaney has well demonstrated. [*Id.* p. 1034 and 1035].

In similar fashion, the Club Owners quote a sentence from *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. White Motor Corp.,* 505 F.2d 1193, (8th Cir. 1974), *cert. den.* 421 U.S. 921, 95 S.Ct. 1588, 43 L.Ed.2d 789 (1975), which affirmed a final judgment and decree entered by Judge Larson in the District of Minnesota specifically enforcing an award of Seitz, Arbitrator, 61 Lab. Arb. 320. The Court of Appeals panel in *White Motor Corp.* was composed of Chief Judge Gibson, Judge Stephenson, and Judge Bright. That panel, composed of two judges who had joined Judge Ross' dissent in *Laundry, Dry Cleaning & Dye House Workers International Union Local No. 93, supra,* agreed that:

In resolving this case, we note initially that judicial review of an arbitrator's decision is limited. The scope of that review is discussed by the Supreme Court in *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960):

The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The Federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards. \* \* \*

\* \* \* \* \* \*

Fn. 6.

See . . . (the *Steelworkers Trilogy); Western Iowa Pork Co. v. National Bro. Pack & Dairy Wkrs.,* 366 F.2d 275 (8th Cir. 1966). In *Western Iowa Pork,* this court stated that " \* \* \* in making the determination of whether an arbitrator has exceeded his authority the agreement must be broadly construed with all doubts being resolved in favor of his authority." 366 F.2d at 277.

\* \* \* \* \* \*

Thus, our function is limited solely to determining whether the arbitration decision, in the language of the Supreme Court, "draws its essence from the collective bargaining agreement." 363 U.S. at 597, 80 S.Ct. at 1361.

\* \* \* \* \* \*

Our review of the record satisfies us that the arbitrator arrived at a decision drawn from the contract documents and from the history of the agreements leading up to the 1971 Collective Bargaining Agreement. We conclude, contrary to the Company's contentions, that the arbitrator did not exceed his arbitral authority and that his award is valid since it "draws its essence from the collective bargaining agreement." *United Steelworkers of America v. Enterprise Wheel & Car Corp., supra,* 363 U.S. at 597, 80 S.Ct. at 1361.

Accordingly, the district court properly enforced the arbitrator's award. [*Id.* at 1197, 1199]

*Valmac Industries, Inc. v. Food Handlers Local 435*, 519 F.2d 263 (8th Cir. 1975), petition for *cert.* filed 44 U.S.L.W. 3310 (Oct. 31, 1975), is the most recent Eighth Circuit case applying federal labor policy. The case stated:

The congressional policy favoring arbitration as a means of resolving industrial disputes was firmly recognized in the *Steelworkers Trilogy:*

Apart from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions of the collective agreement. [*Id.* at 267]

The language quoted from the Eighth Circuit cases restates familiar principles of federal labor law. The Eighth Circuit, this court, and every other lower federal court, are required to apply those principles which were announced in the *Steelworkers* trilogy to all cases involving arbitration clauses of all collective bargaining agreements. The Eighth Circuit cases do not, however, support the Club Owners' claim that "seldom, if ever, has there been a case in which the losing party had such a strong likelihood of prevailing on appeal. . . ." Indeed, those cases lead to just the opposite conclusion.

The Club Owners have more frequently cited and relied upon language quoted from the Fifth Circuit case of *Local U. No. 787, Inter. U. of E. R. & M. Wkrs. v. Collins Radio Co.*, 317 F.2d 214 (5th Cir. 1963), than any other case to which they have directed this Court's attention during the course of this litigation. *Collins Radio*, on its facts, is one of the few cases in the books which reflects, in sharp contrast to the factual circumstances involved in this case, a situation in which the parties to a collective bargaining agreement really agree that a particular grievance is to be excluded from the coverage of an arbitration clause, and use specific language to exclude that particular grievance from the arbitration procedures of their collective bargaining agreement. In *Collins Radio,* a strike followed the expiration of the parties' labor contract. The company immediately hired a skeleton force, advising the strikers that if they did not return to work they would be permanently replaced. The company hired 65 replacement workers and advised 65 of its former employees in writing that permanent replacements had been hired in their old jobs. The background bargaining history reflected the following:

The status of these workers listed as permanently replaced was also the subject of extensive bargaining as the negotiations culminating in the contract of July 1, 1960, were carried on. The Union proposed that the Employer (1) reinstate all strikers with full seniority rights, (2) that it show the specified 65 on the hiring list, and (3) that it arbitrate the question of whether or not these listed persons were permanently replaced. The Employer rejected each of these proposals. The Employer's response was an insistence on exclusionary clauses in the grievance procedure. [Id. at 217]

In *Collins Radio* the grievance procedure article in the labor agreement, comparable to Article X in the 1973 Basic Agreement involved in this case, "expressly excluded . . . any controversy as to whether an individual had been permanently replaced." In a footnote, the court quoted, not one, but two sentences which the parties added to the grievance and arbitration clause. They first stated that: "No grievance, the basis for which occurred prior to the date of the signing of this agreement shall be considered or be subject to adjustment." [*Id.* at 217–218, n. 7] The second sentence added a proviso which stated ". . . whether any individual has been permanently replaced or not prior to the date of signing of this agreement will not be the subject of a grievance and will not be subject to arbitration." [*Id.* p. 218]

Chief Judge Brown pointed out that "the parties by the plainest of language excluded this controversy and all those growing out of it from the grievance machinery," that "there is no question about the exclusion," and that "it is plain and positive." The district court's order denying the union's application for an order compelling arbitration under those factual circumstances was accordingly affirmed.

The relevancy of *Collins Radio* to the Club Owners' Rule 62(c) motion is reflected by what the Fifth Circuit said in regard to the routine question of federal labor law presented by an action to compel arbitration. That court stated:

> This case, as we see it, presents not a single new issue. Its disposition depends on application of now well settled principles. The only difficulty is the difficulty inherent in the exercise of the judicial function as now so narrowly circumscribed by the celebrated [*Steelworkers*] trilogy without transgressing the posted off-limits of the more spacious domain preserved exclusively for the arbiter.
>
> \* \* \* \* \* \*
>
> Resolving doubts in favor of coverage "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail \* \* \*." In nearly every instance we have found that evidence wanting. [Id. p. 216]

The Club Owners' effort to make the requisite strong showing of success on appeal is primarily based on their contention that various findings of fact will be found by the Court of Appeals to be "clearly erroneous" within the meaning of Rule 52(a) of the Federal Rules of Civil Procedure. The difficulty with that argument is that the Club Owners do not direct attention to a single labor arbitration case decided by any Court of Appeals or by the Supreme Court in which the findings of fact made by a district court were found to be clearly erroneous.

Part J and K, page 17, of the Club Owners' final brief were added after we forwarded counsel a copy of the Final Judgment and Decree which we had concluded should be entered. Club Owners complain that the Final judgment and Decree is "fatally defective." Club Owners concede that the parties to this litigation are bound by the Final Judgment and Decree.

The Final Judgment and Decree in this case was drawn in the language of Rule 65(d) and directed the Players Association to serve any person whom it believed might be bound with a copy of the Final Judgment and Decree so that the question of whether such person had, in fact, received actual notice would be eliminated as a matter of factual dispute in any future contempt proceedings which may at some later time be instituted.

The Final Judgment and Decree, of course, does not presume to prejudge the question of whether non-party persons who may receive actual notice may or may not have acted "in active concert or participation" with a party to the action within the meaning of Rule 65(d). Such a question would be presented and decided only in the event it should, at some time in the future, become necessary to institute contempt proceedings for an alleged violation of the Final Judgment and Decree.

The Club Owners' contention that the Final Judgment and Decree is vague and indefinite is clearly without merit.

## IV.

### CLUB OWNERS' ATTEMPT TO SHOW THAT, UNLESS A STAY IS GRANTED, CLUB OWNERS WILL SUFFER IRREPARABLE HARM

The Club Owners present a complete change of front in regard to the supposed harm which would result from the enforcement of the Award of the Arbitration Panel. As footnote 12 on page 251 of our Memorandum Opinion of February 3, 1976 details, the Club Owners contended on the merits that by reason of the Award "the Reserve System has been destroyed, as utterly as if by

antitrust decree [and that] if the arbitrator's award is permitted to stand, the Clubs will have lost—by a spurious and arrogant theory of contract 'interpretation'—the very thing they successfully defended in *Flood v. Kuhn,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972)." The Impartial Arbitrator was charged with having "arrogated to himself jurisdiction of the purported grievances . . . determined that the historic Reserve System was something quite different from what everyone had thought it was [and] with a stroke of a pen . . adopted a baseless and disingenuous 'theory' of the Association . . . fundamentally upsetting baseball's status quo and putting at risk millions of dollars."

The Club Owners' brief in support of its Rule 62(c) motion at long last recognizes that neither the Award nor the Final Judgment and Decree of this Court can have any direct effect upon what the Club Owners call their "historic Reserve System" and "baseball's status quo." For it is clearly apparent that the Club Owners' attempt to show irreparable harm is confined solely to the Los Angeles Dodgers. The Club Owners make no attempt to show, for example, that the plaintiff Kansas City Royals would suffer irreparable harm by being permitted to negotiate and deal with respect to employment with grievants Messersmith or McNally. Nor do the Club Owners attempt to show how any of the other 22 plaintiff-intervenors would suffer irreparable harm by being permitted to negotiate and contract for the services of a National League pitcher who won more games during the 1974 and 1975 baseball seasons than any other pitcher in the National League and who was among the leading National League pitchers during each of those seasons in the categories of Earned Run Average, Innings Pitched, Shut-Outs, Strike-Outs, Games Started and Games Completed.

The Club Owners' argument is based solely on the general notion that "if the Los Angeles Dodgers should lose Andy Messersmith, they will suffer irreparable injury." That showing is not made because neither the Award nor the Final Judgment and Decree interferes in any way with the Los Angeles Dodgers' ability to keep grievant Messersmith, assuming he agrees to contract with them.

We find and conclude that the Club owners have not even attempted to make a showing of irreparable harm in regard to any party plaintiff except the Los Angeles Dodgers. We further find and conclude that the showing attempted on behalf of the Los Angeles Dodgers is based upon conjecture and speculation and that it is insufficient to establish the requisite criteria of irreparable harm to the Club Owners under the circumstances of this case.

V.

## STAY WILL NOT HARM ANY OTHER PARTY

■ We find and conclude that the Club Owners have not established that the Players Association or the players it represents would not be harmed by an order of court suspending the Final Judgment and Decree pending appeal. The burden, of course, rests upon the Club Owners to make that showing. The burden does not rest upon the Players Association to establish that a stay would, in fact, harm it or any of its members. If it were proper for us to make a finding other than a finding that the Club Owners have not carried the burden of making an appropriate showing of lack of harm to others, we would find and conclude that, as between the Los Angeles Dodgers and grievant Messersmith, the clear and convincing weight of the data before this Court is in favor of harm which Mr. Messersmith would suffer if the stay is granted, rather than the harm to the Los Angeles Dodgers, if the stay is denied.

Mr. Messersmith stated in an affidavit that:

Any delay in permitting me to exercise my rights as set forth and confirmed in the Arbitration Award will

result in substantial harm to me, bearing in mind the following factors:

a. Spring Training is scheduled to begin for the major league clubs in approximately five weeks.

b. To properly exercise my rights to negotiate and contract in a free market, I will need to contact and possibly enter into discussions with each of the twenty-four clubs. To do so will require a minimum of several weeks, and to maximize my value to any of the clubs, I should be prepared to sign a contract and report for the opening of Spring Training.

c. My value to any of the clubs, in the context of the terms and conditions of a contract for my future services, will be based on my past performance. I believe my past performance indicates that I have great value to a potential employer. However, should there by any delay in permitting me to exercise my rights to function in a free market, I face numerous risks, including accidental injury, which would dissipate my value and bargaining position.

d. I am presently thirty years of age. Based on general experience in the baseball industry, it would not be justified to assume that I can perform at a peak level for more than five more years, under the best of circumstances. Should there be a delay which would interfere with my ability to negotiate appropriate compensation for the 1976 season, it will have a substantial negative effect on the totality of my career earning opportunities.

Mr. Messersmith's affidavit also states that, on the basis of his record, he believed that he is a pitcher of similar talent to that of "James A. Hunter, who had previously been a starting pitcher for the Oakland Athletics," and that Mr. Hunter, immediately after being declared to be a free agent as a result of an arbitration award made by the same panel involved in this case, "was able to negotiate with each of the twenty-four clubs and, on December 31, 1974, signed a five-year contract with the New York Yankees, which has been estimated to have a value of $3.75 million dollars." The Club Owners have not presented any data to the contrary.

## VI.

### STAY WOULD DO NO HARM TO THE PUBLIC INTEREST

The accepted criteria in regard to the public interest is that a Rule 62(c) movant must make an appropriate showing that "the granting of a stay would do no harm to the public interest." *North Central Truck Lines, Inc. v. United States, supra.* The Club Owners argue that "this Court can take judicial notice—as the Supreme Court did—that 'baseball is everyone's business.'" The Club Owners once again quote dictum from Judge Cooper's District Court opinion handed down six years ago in *Flood v. Kuhn, supra,* to support the Club Owners' concluding argument that "this Court can, and should, preserve the *status quo ante.*"

We have heretofore expressed our view that "the Congress of the United States has not vested this or any other court of the United States with any power and jurisdiction to act as some sort of a guardian of what the Club Owners refer to in their brief as the national pastime." [Page 56 of the transcript of the proceedings in this Court on January 26, 1976] The question presented is not whether some party believes the public interest would be served by a continuation of the status quo pending appeal, but whether an appropriate showing can be made that the granting of a stay would do no harm to the public interest.

The public interest involved in this case is not established by the fact that parties to the collective bargaining agreement happen to be employers and employees engaged in the interstate business of operating and playing for baseball clubs. The public interest in-

volved is whether all parties to collective bargaining agreements are to comply with the long-standing principles of federal labor policy established by the Congress of the United States and explicitly recognized by the Supreme Court of the United States.

The Club Owners have not, in our judgment, made any showing that a stay would do no harm to the public interest. Indeed, if called upon to make a finding in regard to what would serve the public interest, we would find that the public interest is best served by the application of settled principles of federal labor law, and that the baseball industry be treated no differently from any other interstate industry. Although Professional Baseball owners, managers and players may not always completely agree with the decision of the umpire, they undoubtedly recognize that it would not be in the best interest of the game to apply one rule for one team and a different rule for another. We do not believe it is in the public interest to apply a special rule for baseball which would not be applied to other industries which are subject to federal labor law.

We further believe that, in another sense, the public interest will be served rather than harmed by a refusal to suspend the operation of the Final Judgment and Decree pending appeal. That belief, which we have heretofore stated of record, is based upon the universal experience that labor disputes are settled at the negotiating table, not by court litigation. See *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

The sooner this litigation is finally determined, the closer the parties will be to meaningful negotiation of a new bargaining agreement which will hopefully assure the public of another exciting championship season full of home runs and double plays rather than strikes or lockouts. Indeed, with the assistance of television, which has so substantially affected the baseball industry, the public may be able to witness another game almost as exciting as the Sixth Game of the 1975 World Series.

## VII.

Upon a full and careful review of the record and suggestions in opposition and in support of Club Owners' pending Rule 62(c) motion, we find and conclude that the Club Owners have failed to meet any of the four criteria discussed above.

The reports of *Environmental Defense Fund, Inc. v. Froehlke,* 348 F.Supp. 338, 366 (W.D.Mo.1972); and 368 F.Supp. 231, 255 (W.D.Mo.1973), show that we denied Rule 62(c) motions in both instances because of the failure of the appealing party to establish the four requisite criteria discussed in this case. The appealing party unsuccessfully sought relief in the Eighth Circuit and in the Supreme Court. We did not grant any stay of execution in either instance.

Subsequently, in *Reserve Mining Company v. United States,* (8th Cir. 1974) 498 F.2d 1073, the Court of Appeals granted a short stay of an order entered in the District of Minnesota which would permit the parties a reasonable time to make appropriate application to the Court of Appeals pursuant to Rule 8(a) of the Federal Rules of Appellate Procedure. Counsel in this case have demonstrated that they can prepare motions and submit briefs in relatively short periods of time. We are confident that the Court of Appeals will be in a position to consider an application under Appellate Rule 8(a) in a more orderly fashion if counsel are given an opportunity to prepare appropriate papers for the Court of Appeals. For that reason, and in spite of the fact that the Club Owners have made no appropriate showing for any relief pending appeal, the Court, on its own motion, will order that execution of the Final Judgment and Decree be stayed for a period of ten days in order that the Court of Appeals have the benefit of thoroughly prepared papers in support and in opposition of any application which may be presented.

## VIII.

For the reasons stated, it is

Ordered (1) that the Club Owners' pending Rule 62(c) motion should be and the same is hereby denied. It is further

Ordered (2) that, on the Court's own motion, the execution of the Final Judgment and Decree entered· in this Court on February 10, 1976, be stayed for a period of ten (10) days from the date of this order. It is further

Ordered (3) that should the Court of Appeals fail to take any action pursuant to Rule 8(a), Fed.R.App.P., within ten (10)· days from the date of this Order, our stay shall no longer be effective and the Final Judgment and Decree shall be considered in full force and effect.